UNITED STATES of America,
Plaintiff–Appellee,

v.

Sebe T. WOODY, Defendant–Appellant.

No. 94–1387.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1994.

Decided May 5, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied May 30, 1995.

John J. Tharp, Jr., Juanita Temple (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

J. Michael McGuinness (argued), Elizabethtown, NC, for defendant-appellant.

Before POSNER, Chief Judge, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Sebe Tron Woody appeals his conviction and sentence for two counts of forcibly assaulting federal law enforcement officers in violation of 18 U.S.C. § 111 and one count of possessing stolen mail in violation of 18 U.S.C. § 1708. On appeal, Woody contends that the district court committed reversible errors, including improperly joining the stolen mail and assault charges for trial, erroneously denying the defense motion to suppress the evidence obtained from the search of Woody's car incident to his arrest, and improperly instructing the jury. Woody also argues that he was deprived of his Sixth Amendment right to the effective assistance of counsel, that the prosecutor's comments during closing argument were prejudicial and amounted to a denial of due process, also that the government's evidence was insufficient to support Woody's convictions. In addition, Woody claims that the district court erred in calculating his sentence pursuant to the federal sentencing guidelines. We affirm Woody's conviction and sentence.

## I. FACTUAL BACKGROUND

On March 17, 1993, shortly after 9:00 a.m., Woody gave a forged check in the amount of $550, drawn on the account of Lloyd Semple and made payable to Karen Schofield, to his friend Susan Derby, who attempted to cash the check at the Western Springs National Bank in Naperville, Illinois. Unbeknownst to either Woody or Derby, Karen Schofield was a former bank employee and was well known to the bank's tellers. The bank teller to whom Derby presented the forged check refused to cash it, but permitted Derby to deposit the check in Karen Schofield's account. Subsequently Derby left the bank without any funds.

Later that day, at about 11:00 a.m., Officer Baker of the Naperville, Illinois Police Department observed a brown, two-door Datsun 310 hatchback traveling at approximately fifty-four miles per hour in a forty-five miles per hour zone. Policeman Baker entered the Datsun's license plate number in his patrol car's computer and found that the Datsun's license plates were registered to a 1982 Ford. Officer Baker activated the flashing overhead lights on his squad car and immediately observed a flurry of activity on the part of the passengers in the brown Datsun. Both the front and back seat passengers turned to look at the police car and then bent down. The Datsun's driver, Woody, pulled the vehicle over to the curb, exited the vehicle and quickly approached Officer Baker's squad car. Officer Baker informed Woody that he had stopped him because the license plates on the Datsun were registered to another vehicle. Woody explained that his own car, a Ford, was in for repairs at a Goodyear dealership, that he had borrowed the Datsun from the dealership, and that he had placed the Ford's license plates on the Datsun so that he could operate it. Officer Baker directed Woody to return to his car while Baker checked the status of his driver's license.

Officer Baker watched Woody and his two passengers while he waited for a response to his computer query regarding Woody's driver's license. Baker observed the front seat passenger, later identified as Cyrus Spaulding, as he appeared to lean forward, open

and close the glove compartment. After Baker's check on Woody's license revealed that it had been revoked, he radioed for assistance. When Officer Sytar arrived shortly thereafter, Baker walked to the Datsun and asked Woody to step out of the car. Officer Sytar asked the Datsun's two passengers to step out of the car while Officer Baker took Woody back to the squad car and placed him under arrest for driving with a revoked driver's license, having no proof of insurance, and making improper use of vehicle registration.

While Officer Sytar detained the two passengers just behind the Datsun, Officer Baker searched the passenger compartment of the car. When he found the glove compartment was locked, he used the ignition key to unlock it. In the glove box, Baker discovered a white, unsealed business envelope filled with seventy-one personal checks and two money orders.[1] These checks were neither made payable to Woody or his passengers nor were they drawn on accounts held by Woody or his passengers.[2] Officer Baker returned to the squad car, advised Woody of his *Miranda* rights, and inquired of Woody about the checks. Woody claimed that he was employed as a courier for a trucking company and that it was his job to deliver the checks pursuant to his employer's instructions. Woody refused to explain where or to whom the checks were to be delivered. Woody told Baker that he had no knowledge as to why some of the checks were in a state of completion while others were blank because he "just delivers them" and knew nothing more about them.

Officer Baker conveyed the defendant Woody to the police station where Detective Bisch questioned him concerning the checks. Bisch told Woody that he thought the checks had been stolen, a federal offense because it

involved the United States mail. During the trial before the jury, Bisch testified that Woody replied that the police "had nothing on him" and "couldn't prove that they were stolen from the mail" because the police had found no envelopes for the checks. Woody also told Bisch that all the police could hold him for was "possession of stolen property, ... a misdemeanor, and that he could bond out, and ... be out by that afternoon." Woody was subsequently charged in an indictment with possession of stolen mail in violation of 18 U.S.C. § 1708, and released on a $4,500 bond.

Woody's check-cashing operation continued on March 25, 1993, at around 8:30 or 9:00 a.m., when he picked up Denise Peterson, a heroin addict, and took her to get her morning "fix." The two then drove to the Mid-City National Bank in North Riverside, Illinois, where Woody handed Peterson a check to cash in the amount of $460 drawn on the account of Lloyd Semple and made payable to Betty De La Rosa. Peterson cashed the check, returned to the car, gave Woody half of the cash, and retained the other half. Woody and Peterson then proceeded to the Rolling Meadows courthouse, where Woody had a scheduled court appearance on an unrelated case.

The police, who suspected that Woody was in possession of stolen checks in addition to those found in his glove box, set up a multijurisdictional surveillance team, employing postal inspectors as well as local police, to monitor Woody's actions. This surveillance began on the same day, March 25, 1993, at the Rolling Meadows courthouse, where Detective Bisch observed Woody exiting the parking lot after his court appearance. Woody, still accompanied by Peterson and followed by law enforcement officers, drove to the North Riverside shopping mall, where

---

**1.** The victims of the defendant's forgery scheme were all individuals from the western and northwestern Chicago suburbs. Twenty-nine of the checks were blank personal checks from the accounts of Lloyd Semple, Sidney Orlov, and Eileen Quinn. One check, in the amount of $500 drawn on Eileen Quinn's account, was made payable to Lisa Meskan. One check, in the amount of $440 drawn on Eileen Quinn's account, was made payable to Kim Irbe. One check, in the amount of $600 drawn on Lloyd

Semple's account, was made payable to Lisa Meskan. Irbe and several of the other victims testified that certain of those checks found in the Datsun's glove box were checks they had written to pay household bills which they had last seen when they placed them in their mailboxes.

**2.** All of the checks were preprinted with the names and addresses of the account holders.

he retrieved a blank check drawn on Sidney Orlov's account from the trunk of the car and filled in the check for $600 payable to Betty De La Rosa. Peterson, again at Woody's direction, took the check to the branch of the Mid–City National Bank inside the mall, cashed it, returned to the car, and gave Woody most of the money. Immediately after Peterson returned to Woody's car, Postal Inspector Randy Brown approached the car to arrest Woody and Peterson. Brown testified that he made eye contact with Woody, held out his badge and yelled "Police. Stop." when he was within one or two car lengths of Woody's vehicle. Woody accelerated away from Inspector Brown with enough speed to throw Peterson to the floor of the car, spun the car to the left, and accelerated out of the parking lot. Detective Gustafson of the Western Springs Police Department was standing in the roadway blocking Woody's path. Gustafson was also holding up his badge and yelling, "police," but Woody floored the gas pedal, forcing the detective to dive onto the sidewalk and out of harm's way. Woody drove up over the curb to avoid another police vehicle, and proceeded northbound. With their sirens blaring and lights flashing, the police pursued Woody, but failed to apprehend him at that time.

Later that same afternoon, postal inspectors received information that Woody had just made a telephone call from a nearby gas station.[3] Postal Inspector Tokarski proceeded to the gas station in his vehicle and inquired of the uniformed attendant if he had seen an individual matching Woody's description. The attendant informed Tokarski that a man fitting that description was living in the apartment building next door to the gas station. At this time Inspector Tokarski recognized Woody's car parked near the apartment building, and returned to the gas station and called for backup assistance.

Woody was just getting into his car when Tokarski returned to the apartment building. Tokarski, who was dressed in civilian clothing, ran to the back window of Woody's car,

drew his gun and banged his weapon several times on the rear passenger side of the car. He yelled to Woody, "Police. You're under arrest. Turn off the car and put your hands on the window." Tokarski testified that Woody then turned, made eye contact with the inspector, and dropped the transmission into reverse. Woody accelerated in reverse and turned the car in Tokarski's direction. The inspector jumped back, but was unable to reach safety; Woody's Datsun struck Tokarski in his left knee.[4] Woody did not stop the car until it was directly facing Inspector Tokarski. When Woody put the car in forward gear and began to accelerate toward the inspector, Tokarski fired four rounds at the vehicle. Woody veered away from Tokarski and peeled out of the parking lot, leaving skid marks behind. Postal Inspector Erickson had arrived at the scene by the time Woody exited the lot. Erickson had to dive away from the road to avoid being hit by Woody's car, and fired two shots at Woody as he sped away. For the second time that day, Woody evaded arrest.

Shortly thereafter, Woody telephoned his former girlfriend, Billie Harlan, at her home and told her that "he was being chased by the police and that he had just been shot at" and asked for help. Harlan invited Woody to her home. When he arrived, he related that he had "just gotten away from the police" and that "they had shot at him and that he had hit" a "fed" with his car. Harlan arranged for Woody to stay at the house of one of her friends in Elmhurst, Illinois.

On March 29, 1993, Postal Inspectors Terry Wilson and Randy Brown received information that Woody was hiding in an apartment in Cicero, Illinois.[5] Inspectors Wilson, Brown, and Medve went to the apartment and were permitted to look around the apartment by the man who answered the door. The inspectors found Woody hiding in a closet under a pile of dirty clothing and arrested him. Woody, a natural blond, had a bottle of dark brown hair coloring rinse in his coat

3. The record does not contain any further information about this tip.

4. The injuries to Tokarski's knee required medical treatment.

5. The record does not contain any further information about this tip.

pocket. Woody sat handcuffed to the kitchen table and was watched by Postal Inspector Medve while Postal Inspectors Wilson and Brown searched the apartment. Woody remarked [6] that the inspectors "are not going to find any checks here, ... [because] he had thrown them away." Once in the police car, Woody also stated that he did not try to run "that guy" over and said that the man in fatigues—presumably a reference to Inspector Tokarski, who was not in uniform but was wearing an army-style jacket—"didn't like him." He also commented that he intended to change his identity and move away.

Woody was charged with two counts of forcibly assaulting federal law enforcement officers in violation of 18 U.S.C. § 111 and one count of possessing stolen mail in violation of 18 U.S.C. § 1708. Woody testified at trial that his employer, the owner of a trucking company, gave him the checks found in the Datsun's glove compartment, and that he was supposed to deliver them according to his employer's instructions. Woody never explained any further what those instructions were concerning the checks recovered in his car. Woody denied stealing the checks from mailboxes and claimed that he did not know the checks were stolen. Woody also stated that he was unaware that his passenger, Denise Peterson, had cashed a forged check at the Mid–City National Bank in the North Riverside shopping mall on March 25, 1993. Although Woody admitted seeing, and avoiding with his vehicle, the postal inspector and police officer who attempted to arrest him in the mall's parking lot, he contended that he neither heard their commands to stop nor saw their outstretched hands holding badges. Woody denied hearing any sirens or seeing any flashing lights as he exited the shopping mall's parking lot at high speed.

Woody claimed that he was "almost deaf" in his left ear, and that he did not hear Inspector Tokarski banging on the rear of his car as he attempted to leave his friend's apartment later that day. Woody claimed that he turned his head before backing out of the parking space but did not see Inspector

Tokarski standing behind his car. Woody stated that he first realized a man was behind the car when he heard "a big bang," swung his head around, and saw "a gun in [his] face." Woody testified that he "floored it" out of the parking lot "laying on the front seat of [the] car because [he] was getting shot at from behind." He stated that he never saw Inspector Erickson dive to avoid his car because he had his head down below the steering column as he sped away. Woody admitted that he was hiding from the law enforcement officers when they found him in the closet of another friend's apartment.

The jury convicted Woody of two counts of forcibly assaulting a federal law enforcement officer and one count of possessing stolen mail. The district court sentenced Woody to 48 months of imprisonment on the count for possession of stolen mail, 72 months on the first count for forcibly assaulting a federal law enforcement officer, and 72 months on the second count for forcibly assaulting a federal law enforcement officer, for a consecutive total of 192 months of imprisonment, to be followed by three years of supervised release. The court also ordered Woody to pay a special assessment of $150.

## II. ISSUES

Woody appeals his conviction and his sentence. He argues that reversal of his conviction is warranted because: (1) the evidence introduced at trial was insufficient to support his conviction for forcibly assaulting federal law enforcement officers and possessing stolen mail; (2) at trial the district court impermissibly joined the two counts of forcible assault with the single count for possession of stolen mail; (3) the court erroneously admitted into evidence the checks found in Woody's locked glove compartment after an unlawful search; (4) the court misinstructed the jury on (a) the required elements of a violation of 18 U.S.C. § 111 entitled "Assaulting, resisting, or impeding certain officers or employees," (b) Woody's claim that he acted in self-defense, and (c) Woody's constructive

---

**6.** None of the remarks Woody made either at the apartment or in the police car were in response to police questioning.

possession of the stolen checks; (5) Woody was denied his Sixth Amendment right to effective assistance of counsel; and (6) the prosecutor's statements during closing argument, including his comments on Woody's veracity, deprived him of a fair trial. The defendant also argues that the district court committed multiple errors in calculating his 192 month sentence under the United States Sentencing Guidelines.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

A defendant seeking to overturn a jury's verdict based on the sufficiency of the evidence "must overcome a very high hurdle." *United States v. Billops*, 43 F.3d 281, 284 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We will reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir.1994) (citation omitted). "When the trier of fact is a jury, we must 'defer to reasonable inferences drawn by the jury and the weight it gave to the evidence.'" *United States v. Hill*, 40 F.3d 164, 166–67 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1385, 131 L.Ed.2d 238 (1995) (quoting *United States v. Beverly*, 913 F.2d 337, 360 (7th Cir.1990), *cert. denied*, 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991)). The deference we accord to the jury's findings is inviolable; "[w]e will not reweigh the evidence or reevaluate the credibility of witnesses." *United States v. Kellum*, 42 F.3d 1087, 1091 (7th Cir.1994).

■ Woody contends that the record fails to support his conviction on the two counts of forcibly assaulting a federal law enforcement officer and one count of being in possession of stolen mail. He claims that a rational jury could not have found him guilty beyond a reasonable doubt because the evidence did not establish the requisite elements of each of the offenses charged. Specifically, the defendant argues that the state presented no evidence to establish either that he knew the checks found in his glove box were stolen or that he intended to harm Inspectors Tokarski and Erickson. We disagree.

■ To support a charge of unlawful possession of stolen mail under 18 U.S.C. § 1708,[7] the government must prove that the defendant possessed property stolen from the mails with knowledge that the property was stolen. *United States v. Norwood*, 798 F.2d 1094, 1096 (7th Cir.), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 711 (1986). The government need not present proof of actual knowledge, because " 'an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods.' " *United States v. Clark*, 776 F.2d 623, 627 (7th Cir.1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1363, 84 L.Ed.2d 384 (1985) (quoting *Barnes v. United States*, 412 U.S. 837, 843, 93 S.Ct. 2357, 2362, 37 L.Ed.2d 380 (1973)); *see also Norwood*, 798 F.2d at 1099. In *Barnes*, the defendant was found in the possession of recently stolen Treasury checks payable to persons he claimed he did not know, and the defense presented no evidence of a plausible explanation for possession of the stolen checks consistent with the defendant's innocence. The Supreme Court noted that "[o]n the basis of this evidence alone common sense and experience tell us that [the defendant] must have known or been aware of the high probability that the checks were stolen.... Such evidence was clearly sufficient to enable the jury to find beyond a reasonable doubt that [the defendant] knew the checks were stolen." *Barnes*, 412 U.S. at 845–46, 93 S.Ct. at 2363 (citations

---

7. 18 U.S.C. § 1708 provides in pertinent part: Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted— [s]hall be fined under this title or imprisoned not more than five years, or both.

and footnote omitted); *Clark,* 776 F.2d at 627.

Woody was stopped while driving his own car on March 17, 1993. He misrepresented the car as a "loaner" to the police, although he knew that he had purchased the car just two days earlier.[8] The police discovered seventy-three checks stolen from the residential mailboxes of numerous individuals in the car's locked glove compartment, the key to which Woody controlled. The checks, some of which were blank, were drawn on accounts belonging to neither Woody nor his two passengers. *See supra* n. 2. Woody claimed that he knew nothing about the checks, and that he simply delivered them as he was instructed. When asked for more information about his employer, Woody referred to a trucking company allegedly operating from the address of a restaurant, but he was unable to recall the last name of his immediate superior much less the names of any of the other employees, despite his assertion that he had been employed there for three years. Several checks had Woody's fingerprints on them and he admitted handling them. *Cf. United States v. Hall,* 845 F.2d 1281, 1284 (5th Cir.), *cert. denied,* 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988) (evidence that defendant's fingerprints were found on a check mailed to, but never received by, its intended recipient sufficient to support a conviction for possession of stolen mail). Although Woody did not cash the checks himself, he accompanied others, including Susan Derby and Denise Peterson, who cashed the forged checks and turned over some, if not most, of the proceeds to him.

Woody's statements to law enforcement officers give credence to the inference that he had knowledge that the checks were stolen. After his first arrest on March 17, 1993,

Woody freely informed Detective Bisch that all the police could book him for was "possession of stolen property, ... a misdemeanor." After his second arrest on March 29, 1993, he told a postal inspector that the inspectors searching his friend's apartment would not find any more checks because "he had thrown them away."

▮▮▮ Contrary to the defendant's assertions, the government presented overwhelming evidence to support his conviction for being in possession of stolen mail. The jury was entitled to disbelieve Woody's implausible explanation that his employer, the unidentified owner of a trucking company supposedly operating out of a restaurant, hired him to deliver loose checks drawn on various individual accounts to unspecified locations. This court will not disturb the jury's credibility determinations. *Kellum,* 42 F.3d at 1091 ("[w]e will not ... reevaluate the credibility of witnesses"). Once the jury concluded that Woody had presented no plausible explanation for his possession of the stolen checks which would be consistent with his innocence, it was entitled to infer his knowledge that the checks were stolen. *Barnes,* 412 U.S. at 845–46, 93 S.Ct. at 2363. Woody was not "an innocent individual [who] blunder[ed] his way into a prison cell," *Norwood,* 798 F.2d at 1099, but was a common thief, unable to explain away formidable evidence of guilt.

▮▮▮ The evidence in support of Woody's conviction for forcibly assaulting federal law enforcement officers was also abundant. Proof of a violation of 18 U.S.C. § 111, which makes it unlawful to forcibly assault a federal law enforcement officer while that officer is engaged in the performance of official duties,[9] requires proof that the defendant

---

8. Although Woody initially testified that the brown Datsun was a "loaner" from a car repair shop, on cross-examination, prompted by a sales receipt dated March 15, 1993 and bearing his signature, Woody remembered that he had purchased the car just two days before his initial arrest.

9. 18 U.S.C. § 111 provides in pertinent part:
 (a) In general.—Whoever—
 (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [federal law enforcement officer] while engaged in

or on account of the performance of official duties;

 . . . . .

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than three years, or both.
(b) Enhanced penalty.—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon or inflicts

intended to commit a forcible assault. *United States v. Feola*, 420 U.S. 671, 684–86, 95 S.Ct. 1255, 1264–65, 43 L.Ed.2d 541 (1975); *United States v. Staggs*, 553 F.2d 1073, 1076 (7th Cir.1977). The government is not required to establish that the defendant was aware that his intended victim was a federal officer or that the defendant intended to injure that officer. *See United States v. Moore*, 997 F.2d 30, 35 n. 8 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 647, 126 L.Ed.2d 605 (1993) ("[n]o proof of intent to injure or knowledge that the victim is a federal officer is needed"); *United States v. Sanchez*, 914 F.2d 1355, 1358 (9th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991) ("no intent to injure is required for the offense of assaulting a federal officer"). The government may establish proof of a forcible assault by demonstrating that the defendant made " 'such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.' " *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir.1993) (quoting *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987)).

The evidence presented in support of the forcible assault charges against Woody was overwhelming. Woody, who had narrowly escaped arrest earlier that day outside the North Riverside shopping mall, was in his car, ready to leave the parking lot of his friend's apartment building, when Postal Inspector Tokarski approached his motor vehicle with his badge openly displayed and weapon drawn. Tokarski testified that, as he was banging on the rear of Woody's car with his gun, he hollered at him, clearly stating that he was a police officer and yelled to him that he was under arrest and to raise his hands into plain view. Tokarski stated that Woody turned toward him and made eye contact before shifting the transmission into reverse and aiming the vehicle directly at Tokarski, striking his knee. Woody did not stop until his car was facing Tokarski, at which time he switched into forward gear and raced out of the parking lot. He then sped directly toward Inspector Erickson, who had to jump out of the way to avoid

bodily injury, shall be fined under this title or

being hit. This record was saturated with a plethora of evidence from which the jury could find Woody guilty beyond a reasonable doubt of forcibly assaulting federal law enforcement officers.

Woody argues that he did not intentionally assault Inspectors Tokarski and Erickson because he honestly, but mistakenly, thought he was the intended victim of a carjacking and was trying to escape. We agree that there may conceivably be circumstances where a defendant's ignorance or confusion as to the identity of federal law enforcement officers attempting to make an arrest *may* serve to negate an inference of criminal intent. The Supreme Court provided one example in *Feola:*

> [Section 111] does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea.* For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and *an honest mistake of fact* would not be consistent with criminal intent.

*Feola,* 420 U.S. at 686, 95 S.Ct. at 1264 (emphasis added). The key phrase in the Supreme Court's above-described example is "an honest mistake of fact." It would be most difficult if not impossible for a reasonable juror to find, based on the testimony of the witnesses including Woody himself, that Woody was acting under an honest, but mistaken, belief that he was the intended victim of a carjacking. Woody's claim that he neither heard nor saw Inspector Tokarski when he was banging on the back of the car is patently unbelievable. Tokarski testified that he identified himself and his purpose to Woody in a loud voice, before pointing the gun at him. Tokarski stated that the windows to the vehicle were closed and that he did not hear the car's radio playing. After he called the defendant by name, Woody

imprisoned not more than ten years, or both.

eyeballed him, shifted the vehicle into reverse, and aimed the car at Tokarski, striking his knee. Tokarski fired his weapon only after Woody hit him and began accelerating toward him. On appeal, we view the evidence in the light most favorable to the prosecution, *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, and defer to the jury's determinations of credibility. *Hill,* 40 F.3d at 166–67. Here, the jury heard the evidence, and chose to disbelieve Woody's tale of an attempted carjacking. We refuse to disturb the jury's verdict on this issue.

### B. *Joinder of Charges*

■ Woody challenges the joinder of the single count of possession of stolen mail with the two counts of forcible assault under Rule 8(a) of the Federal Rules of Criminal Procedure, asserting that the joinder "allowed the government to enmesh the separate counts, adding an element of violence so as to inflame the jury even on the possession count." Because the defendant failed to file a motion alleging misjoinder prior to trial, he waived this challenge on appeal and we review his claim for plain error. *See* Fed.R.Crim.P. 12(b), 12(f), 52(b); *United States v. Balzano,* 916 F.2d 1273, 1280 (7th Cir.1990). Reversal for plain error is justified only when necessary "to avert an actual miscarriage of justice." *Balzano,* 916 F.2d at 1280 (citation omitted); *see also United States v. Wolf,* 787 F.2d 1094, 1098 (7th Cir.1986) (plain error includes both clear error and prejudicial error, which is error that likely would "have changed the outcome of the trial").

■ Under Rule 8(a) of the Federal Rules of Criminal Procedure, two or more separate offenses may be charged in a single indictment and joined for a single trial if "the offenses charged, . . . are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). This court construes joinder under Rule 8 broadly, "to enhance the efficiency of the judicial system, . . . and to avoid expensive and duplicative trials, if judicial economy outweighs any prejudice to the defendant." *United States v. Archer,* 843 F.2d 1019, 1021 (7th Cir.), *cert. denied,* 488 U.S. 837, 109 S.Ct. 100, 102 L.Ed.2d 76

(1988) (citations omitted). Accordingly, this court has adopted an expansive interpretation of what constitutes a "transaction" under Rule 8(a):

> "Transaction" is a word of flexible meaning and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." . . . In determining whether the connection between the acts charged is sufficient to meet the requirements of joinder under Rule 8(a), the court should be guided by the extent of evidentiary overlap.

*United States v. Berardi,* 675 F.2d 894, 899–900 (7th Cir.1982), *cited in United States v. Koen,* 982 F.2d 1101, 1112 (7th Cir.1992) (upholding joinder of embezzlement count to arson and mail fraud counts because evidence of the defendant's mishandling of money was relevant to establish his motive to commit arson and mail fraud); *see also Balzano,* 916 F.2d at 1280 (witness intimidation count was properly joined to extortion and RICO conspiracy counts because "witness intimidation count was clearly part and parcel of the same criminal scheme").

Woody's two forcible assault offenses upon Inspectors Tokarski and Erickson occurred while they were attempting to arrest him a second time for possession of stolen mail. Evidence of the defendant's first arrest for possession of stolen mail and the subsequent surveillance operation was relevant to establish his motive to assault the inspectors in his ill-fated attempt to avoid apprehension. Woody's arrest for possessing stolen mail was the logical precursor to his assaults on Inspectors Tokarski and Erickson. Woody's assault offenses were clearly "part and parcel of the same criminal scheme," *Balzano,* 916 F.2d at 1280, *i.e.,* to cash forged checks stolen from residential mailboxes without detection from law enforcement. Accordingly, the joinder of the counts for forcible assault and possession of stolen mail was proper.

### C. *Admissibility of Evidence Seized From Locked Glove Compartment*

The police discovered seventy-three stolen checks and money orders in the locked glove

compartment of Woody's car during a search incident to a traffic stop. The defendant argues that the district court committed reversible error when it denied his pretrial motion to suppress this evidence based on his assertions that the traffic stop was pretextual and the ensuing search of the locked glove compartment was unreasonable. We review the district court's denial of a motion to suppress evidence for clear error. *United States v. James,* 40 F.3d 850, 874 (7th Cir. 1994), *cert. denied sub nom. Williams v. United States,* —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995); *United States v. Wilson,* 2 F.3d 226, 229 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994). On appeal, we may consider the testimony presented at the pretrial suppression hearing as well as the testimony produced at trial. *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994). "[B]ecause the resolution of a motion to suppress evidence is highly fact-specific, we [must] give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *James,* 40 F.3d at 874 (quotations omitted). We will reverse for clear error only if we are " 'left with the definite and firm conviction that a mistake has been made.' " *United States v. Robinson,* 30 F.3d 774, 781 (7th Cir.1994) (quoting *Tilmon,* 19 F.3d at 1224).

### 1. The Validity of the Traffic Stop

■ Woody asserts that the traffic stop was simply a pretext to search his car because the police officer's stated reasons for stopping him, *i.e.,* because he was speeding and had license plates on the Datsun which were registered to a Ford, were not worthy of belief. Although Officer Baker arrested Woody for driving with a revoked license, having no proof of insurance, and making improper use of vehicle registration, he did not cite Woody for speeding. Woody argues that this fact alone renders the traffic stop pretextual. We disagree.

■ An arrest conforms to the reasonableness requirement of the Fourth Amendment "so long as the police are doing no more than they are legally permitted and objectively authorized to do." *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989). Thus, "the reasonableness of an arrest depends upon the existence of two objective factors. First, did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense." *Id.*[10] An arrest may be perfectly reasonable even if the police officer ultimately does not charge the suspect for the offense giving rise to the officer's probable cause determination. Indeed, many perpetrators of violent crimes are apprehended when stopped for routine traffic violations.

Officer Baker of the Naperville, Illinois Police Department, testified at the hearing on Woody's motion to suppress that he paced Woody's brown Datsun for about twenty seconds. Once he determined that Woody's speed was approximately nine miles over the forty-five miles per hour limit, he ran a license plate check on his patrol car's computer, which revealed that the license plates affixed to the Datsun were actually registered to a Ford. Either of these motor vehicle violations alone would have given Officer Baker probable cause to stop Woody. Moreover, a municipal police officer is, without a doubt, authorized to stop a defendant for speeding and improper vehicle registration. Officer Baker's stop thus satisfied both requirements under *Trigg* and the district court's determination that the police had probable cause to stop Woody was proper. *See United States v. Quinones–Sandoval,* 943 F.2d 771, 774 (7th Cir.1991) (rejecting defendant's contention that a traffic stop for erratic lane usage was a pretext to search for narcotics).

### 2. Search of the Locked Glove Compartment

■ Woody also argues that the search of his car's locked glove compartment was

**10.** Later in the same case, we recognized that "such an approach virtually eliminates the concept of a 'pretextual arrest.' " *United States v.* *Trigg,* 925 F.2d 1064, 1065 (7th Cir.), *cert. denied sub nom. Cummins v. United States,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991).

unreasonable under the Fourth Amendment. Woody claims not only that the locked glove compartment reflected an increased expectation of privacy, but also that the fact that it was locked prohibited the vehicle's passengers from retrieving any item within it. Woody reasons that because the car's occupants had no ready access to the contents of the glove box, searching the glove box for weapons was unnecessary to protect the safety of the police officers or others within the immediate vicinity. Woody's arguments run afoul of precedents from this circuit as well as the Supreme Court.

■ The government argues and Officer Baker testified that he conducted the search of Woody's car, including the locked glove compartment, as a protective weapons search incident to a lawful custodial arrest. *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) ("when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"). The Supreme Court has articulated two reasons which justify the warrantless search of an automobile after the custodial arrest of one of its occupants: (1) to uncover hidden weapons so as to ensure the safety of the police officers and others nearby, and (2) to prevent the disappearance or destruction of evidence of a crime. *Belton,* 453 U.S. at 460–63, 101 S.Ct. at 2864–65. Thus, an arrest of the occupant of a car justifies an automatic search of the car's passenger compartment, regardless of whether the officers effecting the arrest reasonably believe the arrestee to be dangerous or to be within reach of a weapon, because "[a]n additional interest exists in the arrest context, *i.e.,* preservation of evidence." *Michigan v. Long,* 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1983). The police thus have the right to search the car's passenger compartment, including open and closed containers within the passenger compartment, irrespective of any privacy interests the car's occupants might have in their belongings.

[T]he police may also examine the contents of any containers found within the passen-

ger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.... Such a container may, of course, be searched whether it is open or closed, *since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have.*

*Belton,* 453 U.S. at 461, 101 S.Ct. at 2864 (emphasis added).

We are not persuaded by Woody's argument that the fact that the glove box was locked precluded the possibility that Woody or one of his passengers could have retrieved a weapon hidden within it. In *United States v. Holifield,* 956 F.2d 665 (7th Cir.1992), the defendant raised, and we rejected, an argument similar to Woody's:

Holifield argues that, because the glove compartment was locked with the keys left in the ignition and all occupants had exited the car, the officers could have had no reasonable belief that either Holifield or the passengers could gain immediate control of any weapon located inside the locked glove compartment. This argument overlooks the officers' anticipation that Holifield and his passengers would return to their car and wait while the officers wrote a citation. The fact that the officers anticipated allowing the occupants to reenter the vehicle may be considered in determining whether the officers' protective search of the vehicle was reasonable.... Once the occupants reentered the vehicle, it would have taken only a few seconds for Holifield or one of the passengers to remove the keys from the ignition and unlock the glove compartment, thus giving them immediate access to the pistol.

*Id.* at 668–69 (citation omitted); *see also United States v. McCrady,* 774 F.2d 868, 871–72 (8th Cir.1985). The search of the locked glove compartment was reasonable despite the fact that it occurred while Woody sat handcuffed in the back seat of the patrol car and while Officer Sytar held the two passengers under his control at the side of the road. "[T]he Supreme Court has reject-

ed the reasoning that because the occupants have exited the vehicle and are under the control of officers, the officers could not reasonably believe that they could gain immediate control of a weapon located inside the vehicle. In such a traffic stop, a suspect 'under the brief control of a police officer ... might ... break away from police control and retrieve a weapon from his automobile.' " *Holifield*, 956 F.2d at 669 (quoting *Long*, 463 U.S. at 1051, 103 S.Ct. at 3482). Moreover, at the time Officer Baker conducted the search, neither he nor Officer Sytar had determined whether to release the car to one of Woody's two passengers. *Id.* at 668–69. We are of the opinion that Officer Baker's search of the locked glove compartment was a search incident to Woody's custodial arrest and was both proper and reasonable under the Fourth Amendment.

▌ The district court's denial of the defendant's motion to suppress evidence was proper for a second reason as well: the police would have lawfully discovered the stolen checks in the Datsun's glove compartment even had they not searched the car at the time of Woody's arrest. The police impounded the defendant's car after his arrest. Officers Baker and Sytar concluded that neither of Woody's two passengers, Susan Derby or Cyrus Spaulding, could drive the Datsun.[11] The procedures of the Naperville Police Department mandate an inventory search for valuables contained in any vehicle seized before it is impounded. The defendant does not dispute that the police would have lawfully discovered the stolen checks in the locked glove compartment during an inventory search of the car. *See Colorado v. Bertine*, 479 U.S. 367, 372–73, 107 S.Ct. 738, 741–42, 93 L.Ed.2d 739 (1987). Thus, even if we were to conclude that the roadside search of the locked glove compartment was unlawful, the police, after impounding and in the performance of an inventory search of the vehicle, would have discovered the checks, which would have been admissible against Woody under the inevitable discovery exception to the exclusionary rule. *See Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501,

2511, 81 L.Ed.2d 377 (1984) (holding admissible evidence that "would inevitably have been discovered without reference to the police error or misconduct").

### D. *Jury Instructions*

#### 1. *Elements of a Violation of 18 U.S.C. § 111*

Woody contends that the district court erred in refusing to charge the jury with the defendant's proposed instruction No. 1, which stated that:

> For conviction under 18 U.S.C. § 111, the government would have to prove that the defendant specifically intended to cause bodily harm to Postal Inspector Tokarski.

As we noted above in section III.A., the government need *not* prove that the defendant intended to injure a federal officer to support a conviction for forcible assault of a federal officer under 18 U.S.C. § 111. *See Moore*, 997 F.2d at 35 n. 8 ("[n]o proof of intent to injure ... is needed"); *Sanchez*, 914 F.2d at 1358 ("no intent to injure is required"). As such, Woody's proposed instruction No. 1 was an incorrect statement of the law which the trial court properly rejected.

#### 2. *Self–Defense*

▌ Woody also claims that the district court erred in refusing to instruct the jury that his assault on Inspectors Tokarski and Erickson should be excused if the jury found he acted in self-defense. Woody contends that he reasonably believed that he was threatened with harm from two unknown individuals "brandishing and firing deadly weapons" and that he responded to this perceived threat by fleeing in his car, which was a reasonable force under the circumstances. At trial, Woody failed to request an instruction on self-defense; accordingly, we review the court's failure to give the jury such an instruction only for plain error. *United States v. Cooper*, 942 F.2d 1200, 1205 (7th Cir.1991), *cert. denied*, 503 U.S. 923, 112 S.Ct. 1303, 117 L.Ed.2d 524 (1992).

---

11. When Officer Baker asked Woody's passengers if either could drive the car, Cyrus Spaulding stated that his driver's license had been suspended and Susan Derby explained that her vision was too poor to drive.

■ Generally, a defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988). On the facts of this case, no reasonable juror could find that Woody acted in self-defense for in fact he assaulted Postal Inspectors Tokarski and Erickson. Woody's former girlfriend, Billie Harlan, testified that Woody admitted to her that "he was being chased by the police and that he had just been shot at," that he had "just gotten away from the police," and that "they had shot at him and that he had hit" a "fed" with his car. Inspector Tokarski testified that he identified himself as a law enforcement officer in a loud voice as he was banging on Woody's car with his service revolver.[12] Tokarski stated that Woody made eye contact with him before accelerating his vehicle directly at him, striking and injuring his knee. Inspector Erickson also testified that he made eye contact with Woody before Woody sped out of the apartment building parking lot, forcing Erickson to dive away from the road to avoid being struck by the speeding vehicle. Woody denied making eye contact with either of the two postal inspectors and admitted telling Billie Harlan only that he thought he had been the intended victim of a carjacking. Woody presented no evidence, other than his own self-serving statements which were contradicted by the testimony of several other witnesses, to support his theory of self-defense. Accordingly, the trial court's failure to give an instruction on self-defense was proper. *See United States v. Searing,* 984 F.2d 960, 966–67 (8th Cir.1993) (defendant not entitled to an instruction on self-defense where no reasonable jury could find in his favor).

### 3. *Constructive Possession of Stolen Mail*

■ Woody also challenges the district court's instruction to the jury that a conviction for possession of stolen mail could be based on either actual or constructive possession. The court charged the jury as follows:

[T]he law recognizes two kinds of possession, actual and constructive, actual possession and constructive possession. A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and intention at a given time to exercise domain or control over a thing, either directly or through another person or persons, is then in constructive possession of it. . . . You may find that the element of possession [required for a conviction under 18 U.S.C. § 1708] is present if you find beyond a reasonable doubt that the defendant has actual or constructive possession, either jointly or with others.

This was an accurate statement of the law, approved by every court to have reviewed such an instruction. *See United States v. Johnson,* 741 F.2d 854, 857 (6th Cir.), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984); *United States v. Rhodes,* 713 F.2d 463, 470–71 (9th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 715 (1983); *United States v. Singleton,* 532 F.2d 199, 203–04 & 205 n. 12 (2d Cir.1976); *United States v. Young,* 529 F.2d 193, 196 (4th Cir.1975); *United States v. Romero,* 495 F.2d 1356, 1359 (5th Cir.), *cert. denied,* 419 U.S. 995, 95 S.Ct. 307, 42 L.Ed.2d 267 (1974); *United States v. Ellison,* 469 F.2d 413, 415 (9th Cir.1972). We see no reason to depart from these precedents.

### E. *Ineffective Assistance of Counsel*

■ The defendant also claims on appeal that he was denied his Sixth Amendment right to the effective assistance of counsel. To warrant reversal based on his claim of ineffective assistance of counsel, Woody must demonstrate that "[his] trial counsel's performance was deficient and that such deficient performance so prejudiced [his] defense as to render the result of [his] trial 'fundamentally unfair or unreliable.'" *United States v. Kellum,* 42 F.3d 1087, 1094 (7th Cir.1994) (quoting *Lockhart v. Fretwell,* —— U.S. ——,

---

**12.** Inspector Tokarski also testified that the car's windows were closed, and that if the car's radio was playing, he did not hear it.

————, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993)). Woody has provided us with an extensive list of alleged errors committed by his attorney prior to and during trial. Specifically, Woody contends that his trial counsel: (1) failed to conduct any meaningful cross-examination; (2) elicited severely damaging and inadmissible evidence from police officers; (3) asked Woody on direct examination about the circumstances leading to the revocation of his driver's license; (4) erroneously argued the law in his closing argument; (5) called Woody's veracity into question during closing argument; (6) commented on the truthfulness of prosecution witnesses; and (7) depicted Woody as a common thief in closing argument.[13] In spite of this lengthy list of alleged errors, Woody has failed to make the requisite showing of prejudice essential to a successful Sixth Amendment claim. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). He has failed to establish that but for his counsel's purported errors, he probably would not have been convicted. *Id.; United States v. Herrera–Rivera*, 25 F.3d 491, 497 (7th Cir.1994) ("vague and general allegations are insufficient to satisfy ... the *Strickland* test"). Woody has provided this court with no explanation as to how his counsel's tactical decisions impacted the jury's verdict. Without a detailed explanation of the instances of his attorney's errors as well as their effect on the result, we cannot evaluate his Sixth Amendment claim. *See United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir.1987) ("[t]he district court simply cannot fulfill its obligation under *Strickland* to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information"). It is worth noting that the trial judge commented favorably on the performance of Woody's counsel at both the trial and sentencing phases. At Woody's. sentencing hearing, the district judge specifically noted that Woody's counsel performed well within Sixth Amendment standards:

Mr. Agran, I want to thank you for your taking on this case when you did. You have vigorously presented your client's position. You have presented your client's position even when you, yourself, have disagreed with that position, and I believe you have upheld the appointment under the Criminal Justice Act.

As indicated by the denial of the motion for [a] new trial, I believe that Mr. Baumgart's work in connection with the defense of Mr. Woody at the trial of the case in no way fell below the minimal standards required for adequate representation of counsel and appropriate representation of counsel.

Although we recognize that the trial court's assessment of an attorney's performance is not determinative, the trial judge, a "contemporaneous observer to all of [counsel's] critical decisions" in a case, is often in the best position to evaluate an attorney's actions. *See United States v. Figueroa*, 15 F.3d 706, 711 & n. 11 (7th Cir.1994); *Kellum*, 42 F.3d at 1095. We agree with the trial judge that Woody's trial counsel's performance met the minimum Sixth Amendment standards for the effective assistance of counsel.

### F. Remarks of the Prosecutor During Closing Argument

■ Woody challenges certain remarks made by the prosecutor during closing argument. Because Woody failed to object to these remarks at trial, we review them for plain error, and will reverse "only if a miscarriage of justice would otherwise result." *United States v. Cole*, 41 F.3d 303, 309 (7th Cir.1994).

As with his ineffective assistance of counsel claim, Woody simply listed nine purportedly prejudicial remarks, without any explanation as to why or how they overstepped the bounds of permissible argument based on the facts elicited from the testimony and reasonable inferences drawn therefrom. The prosecutor's statements were all valid comments on the evidence, the veracity of the wit-

---

**13.** The defendant also argues that his trial counsel failed to advise him that his fingerprints were found on some of the checks, failed to show and discuss with him discovery material, and failed to investigate witnesses and call them at trial.

The record is devoid of factual support with respect to each of these asserted deficiencies, and, accordingly, this court has no way to evaluate them.

nesses, and Woody's defenses. None of these remarks even approaches plain error.

### G. *Woody's Sentence*

Woody has raised every possible argument for reversal of his sentence, no matter how remote or unlikely. As none of the reasons he proposes has any merit, we will deal with each summarily.

#### 1. *Enhancement for Obstructing Justice*

 First, Woody claims that the district court erred when it increased his adjusted offense level by two points for obstructing justice under U.S.S.G. § 3C1.1, which authorizes an increase in a defendant's offense level by two levels "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing" of the defendant's offense. The Supreme Court has held that a sentencing court may enhance a defendant's sentence under U.S.S.G. § 3C1.1 *if the court finds that the defendant committed perjury at trial. United States v. Dunnigan,* — U.S. ——, ——, 113 S.Ct. 1111, 1113, 122 L.Ed.2d 445 (1993). However, the sentencing court must make a specific finding that a defendant committed perjury prior to imposing this enhancement.

> [I]f a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.... When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. · *The district court's determination that· enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.*

*Id.* at ——, 113 S.Ct. at 1117 (emphasis added). The "factual predicates" for a finding of perjury are the giving of false testimony while under oath or affirmation "concern-

ing a material matter with the willful intent to provide false testimony." *Id.* at ——, 113 S.Ct. at 1116 (citing 18 U.S.C. § 1621). In *Dunnigan,* the Court held that the sentencing court's findings that "the defendant was untruthful at trial with respect to material matters ... that were designed to substantially affect the outcome of the case" were adequate. *Id.* at ——, 113 S.Ct. at 1117 (emphasis omitted).

Here, the district court made the following findings on the record:

> As to the enhancement of two points for obstruction, the defendant takes the position that the fact that the defendant was found guilty does not mean that his testimony was perjured. The defendant has a constitutional right to testify on his own behalf. It's correct that the defendant has a constitutional right to testify in his own behalf. But I believe that the evidence established that the testimony that he presented was perjured and that the obstruction enhancement was appropriate.

> \* \* \* \* \* \*

> With regard to [the] two-level increase for obstruction of justice, again, Mr. Woody did testify, but, again, I believe he testified falsely when he denied seeing Postal Inspector Erickson [sic Tokarski] on March 25, 1993.

> \* \* \* \* \* \*

> Again, Mr. Woody's testimony with regard to [assaulting Inspector Erickson], I believe, was false, and so there should be a two-level increase for obstruction,

> . . . .

Without question, Woody's testimony concerning the stolen checks and his encounter with the two postal inspectors was material to the outcome of the case, and he testified untruthfully with the intent to deceive the jury into believing that he was innocent of the charges set forth in the indictment. We believe that the district court's determination that Woody committed perjury was proper and sufficient under *Dunnigan* to support an enhancement for obstructing justice.

### 2. Enhancement for Leadership Role in the Offense

 Woody next contends that the district court erred when it increased his adjusted offense level by two levels under U.S.S.G. § 3B1.1(c) for his leadership role in the offense. The district court found that:

> As to the defendant's objection as to his role in the offense, there's no question, based upon the evidence presented, that the defendant had a leadership role in the offense, and there were individuals whom he directed, whom he guided, and who were really in the position of performing his—crimes at his insistence and behest.

We agree that the record contained substantial evidence to support this increase. The defendant recruited at least two individuals, Susan Derby and Denise Peterson, to assist him in his check-cashing operation. He directed their activities and made the decisions without doubt. Woody's role in the offense warranted the two level increase.

### 3. Enhancement for More Than Minimal Planning

 The defendant next challenges the two level increase in his adjusted offense level for more than minimal planning under U.S.S.G. § 2B1.1(b)(5)(A). Woody was found in possession of seventy-three stolen checks belonging to a number of individuals. This evidence clearly resulted from repeated acts of mail theft and justified the enhancement. See U.S.S.G. § 1B1.1, Application note 1(f) ("more than minimal planning" involves "repeated acts over a period of time"). Moreover, Woody sought and obtained the assistance of at least two other individuals, Susan Derby and Denise Peterson, for his check-cashing scheme.

### 4. Enhancement for Official Victim

 Woody argues that the district court's increase in his offense level by three levels because the victim was a government officer was erroneous because his conviction under 18 U.S.C. § 111 required a forcible assault on a federal officer. Woody contends that imposing an enhancement under U.S.S.G. § 3A1.2 constitutes impermissible double counting. We disagree. The Sen-

tencing Guidelines specifically call for an increase in a defendant's adjusted offense level if the victim of the offense "was a government officer or employee; ... and the offense of conviction was motivated by such status;...." U.S.S.G. § 3A1.2(a). This increase does not amount to impermissible double counting because the Guideline requires a higher level of culpability, i.e., the defendant's actions must have been "motivated" by the victim's official status. United States v. Padilla, 961 F.2d 322, 327 (2d Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 138, 121 L.Ed.2d 91 (1992). Accordingly, the district court properly increased Woody's adjusted offense level under this provision of the Guidelines.

### 5. Enhancement for Reckless Endangerment

 The defendant challenges the two-level increase for reckless endangerment under U.S.S.G. § 3C1.2. He contends, without citation to any authority (as there is none to support his position) that he was entitled to flee from Inspectors Tokarski and Erickson when they began to shoot at his car, and that the enhancement for inflicting bodily injury under U.S.S.G. § 2A2.2(b)(3)(A) precluded an increase for reckless endangerment. We disagree.

Woody's assault on Inspectors Tokarski and Erickson was not the first time he "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. On March 25, 1993, Woody fled from the police at the North Riverside shopping mall, and led them on a high speed chase. This conduct, independent of Woody's assaults on the two postal inspectors, was sufficient to justify the reckless endangerment enhancement. See United States v. Chandler, 12 F.3d 1427, 1433 (7th Cir.1994).

### 6. Enhancement for Use of a Dangerous Weapon

 The defendant next challenges the district court's four-level enhancement for his use of a dangerous weapon in the commission

of an aggravated assault under U.S.S.G. § 2A2.2(b)(2)(B). Under the Guidelines, a car can be used as a dangerous weapon because a car is "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1, Application note 1(d). The record reflects that the defendant did indeed operate his vehicle in a dangerous and violent manner. He very well knew that the men approaching his car were law enforcement officers trying to arrest him. Despite this knowledge, in a successful attempt to flee, he intentionally accelerated directly toward them, striking Inspector Tokarski in the knee and forcing Inspector Erickson to jump to the side of the road to avoid being struck and seriously injured. Woody's actions fit squarely within the Guidelines' adjustment for the use of a dangerous weapon.

### 7. *Monetary Loss Calculation*

 The defendant makes the conclusory argument that "[t]here was inadequate evidence to establish the purported [monetary] loss and a four level enhancement." Apparently Woody believes that he should be held accountable only for those stolen checks made payable to individuals, which totalled about $1,700. Because Woody's argument on this issue is entirely undeveloped, we will not consider it on appeal. *Maltby v. Winston,* 36 F.3d 548, 564 (7th Cir.1994) ("summary arguments unsupported by authority are waived"); *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

### 8. *Aggravated Assault*

The defendant argues that the sentencing court had no factual basis from which to conclude that his assault on the two postal inspectors was aggravated, warranting a base offense level of fifteen (as opposed to a base offense level of six for a minor assault).[14] Under U.S.S.G. § 2A2.2, Application note 1, an aggravated assault is a "felo-

nious assault including (a) a dangerous weapon with intent to do bodily harm or (b) serious bodily injury or (c) an intent to commit another felony." Woody intentionally backed his car into Postal Inspector Tokarski, injuring his knee. Woody also operated his vehicle in a most dangerous and violent manner, driving this vehicle directly toward Postal Inspector Erickson, forcing him to jump to save his life. The district court had before it substantial evidence to support the characterization of Woody's assault as aggravated.

### 9. *Criminal History*

Woody also asserts that the use of prior convictions to increase his criminal history category was arbitrary and capricious and deprived him of the right to due process of law. As with several of Woody's other arguments, this one is summary and completely unsupported by caselaw. Accordingly, we will not consider it.

### 10. *Downward Departure Under § 5H1.4*

 Next, Woody, who is HIV positive but who does not have full-blown AIDS, argues that the district court erred in refusing to grant a downward departure under U.S.S.G. 28, 29 § 5H1.4 for an "extraordinary physical impairment." An AIDS-afflicted individual is entitled to a downward departure under § 5H1.4 only when the disease has progressed to such an advanced stage that it could be characterized as an "extraordinary physical impairment." *See United States v. Thomas,* 49 F.3d 253 (6th Cir.1995) (quoting *United States v. DePew,* 751 F.Supp. 1195, 1199 (E.D.Va.1990), *aff'd,* 932 F.2d 324 (4th Cir.), *cert. denied,* 502 U.S. 873, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991)). In granting a defendant's request for a downward departure, a sentencing court is required to "provide articulable reasons, of a type contemplated by ... the Guidelines, and based on a sufficiently sound factual foundation to justify a departure from the Guidelines." *United States v. Carey,* 895 F.2d 318, 322 (7th Cir.1990) (quotation omitted); *see*

---

**14.** The statute under which Woody was convicted provides for an enhanced penalty for any defendant who commits a forcible assault "us[ing] a deadly or dangerous weapon or [who] inflicts bodily injury." 18 U.S.C. § 111; *see supra* n. 9.

*also United States v. Hendrickson,* 22 F.3d 170, 175 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994) ("we must determine whether the facts which underlie the grounds for the departure actually exist"); *United States v. Sherman,* 53 F.3d 782, 785–86 (7th Cir.1995). Woody presented no "sound factual foundation" which would support a downward departure for his HIV positive condition. Accordingly, we refuse to disturb the court's finding that the defendant's physical condition did not warrant a downward departure under § 5H1.4.[15]

### 11. *Downward Departure Under §§ 5K2.10, 5K2.11, 5K2.12*

Finally, Woody argues that the district court erred in refusing to grant a downward departure under either U.S.S.G. § 5K2.10, § 5K2.11, or § 5K2.12. Because Woody failed to request a downward departure under these provisions at sentencing, we deem the issue waived on appeal. *See United States v. Field,* 39 F.3d 15, 21 (1st Cir. 1994); *United States v. Quesada,* 972 F.2d 281, 284 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1348, 122 L.Ed.2d 729 (1993).

### IV. CONCLUSION

We AFFIRM Woody's conviction and sentence.

---

**15.** We agree with the reasoning of a district court in Virginia as to the application of § 5H1.4 to individuals with AIDS:

[Section 5H1.4] provides that "physical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines...." Only an "extraordinary physical impairment" may justify a sentence other than imprisonment. *Id.* AIDS is not such a "physical impairment"; nor is cancer or various other terminal or life threatening conditions.... The Bureau of Prisons ... has the medical personnel and facilities required to furnish defendant with the care and treatment he needs. Indeed, defendant is entitled to that

care and treatment.... Similarly, Bureau of Prisons medical personnel and facilities ... are also fully competent to give defendant the psychological counselling he needs. In sum, defendant's physical condition, while lamentable, is no basis for a departure.... Except in extraordinary circumstances not present here, terminally ill persons who commit serious crimes may not use their affliction to escape prison. Were this rule otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons.

*DePew,* 751 F.Supp. at 1199, *quoted in Thomas,* 49 F.3d 253 (6th Cir.1995).