UNITED STATES of America, Plaintiff–Appellee,

v.

Corey NOBLES, Defendant–Appellant.

No. 94–2561.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1995.

Decided Nov. 1, 1995.

Frances Lupima (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Jeffrey J. Levine (argued), Chicago, IL, for Defendant–Appellant.

Before CUDAHY, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The appellant, Corey Nobles, and his father, Willie Townsend, were arrested at O'Hare International Airport in Chicago, Illinois, on March 21, 1992, and charged with possession with intent to distribute cocaine and cocaine base (crack cocaine). On May 13, 1992, a grand jury returned an indictment against Nobles and Townsend, charging each defendant with conspiring to possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Nobles filed a motion to suppress which was denied. Subsequent to the hearing on the motion, the government discovered that one of the Drug Enforcement Agency (DEA) Task Force officers who testified at the hearing, Officer Granias, had made false representations in the past to the Circuit Court of Cook County in cases to obtain search warrants.[1] The court, on stipulation from both parties, reopened the suppression hearing and received testimony from Officer Pamela Triner, a member of the DEA Task Force, who was also involved in Nobles' arrest. Thereafter, the district court record states that the court, basing its decision solely on the testimony of Officers Triner, Opiola,[2] and Nobles, denied the defendant's motion to suppress, finding that the officers' encounter with Nobles and his father was consensual.[3]

Prior to trial, the government moved to dismiss Count I of Nobles' indictment, the conspiracy to possess and distribute cocaine charge, and the district court granted the motion.[4] The case was tried before a jury, and Nobles was convicted of possession with intent to distribute cocaine, but acquitted of possession with intent to distribute cocaine

---

1. After Nobles' attorney became aware of the allegations against Granias, he filed a motion with the court to reopen the hearing and recall Granias to impeach his testimony. Granias had informed the government that if he was recalled to testify, he would assert his Fifth Amendment privilege. The government and the defense stipulated that Granias' pre-trial testimony was to be stricken from the record in light of the fact that the defense would not be able to attempt to impeach the officer's testimony by cross-examining him about the allegations of misconduct.

2. Officer Anthony Opiola testified at the first suppression hearing.

3. On March 8, 1993, after the hearing on the reopened motion to suppress, the court granted the government's motion to dismiss the indictment against Townsend.

4. The record on appeal contains the trial judge's Order Amending Judgment which states only that "[p]rior to the beginning of trial, and ... upon the government's motion, the Court dismissed Count One of the indictment as to defendant Nobles."

base. The district court entered a judgment of guilty in accordance with the jury's verdict and subsequently denied Nobles' motions for acquittal and a new trial.

Nobles was sentenced to a term of 100 months incarceration, to be followed by five years supervised release, and ordered to pay a mandatory special assessment of $50. Nobles appeals the denial of his motion to suppress, his conviction and sentence. We AFFIRM.

## I. FACTS

On March 20, 1992, Corey Nobles reserved two seats on the 11:44 p.m. American Airlines flight from Los Angeles International Airport (LAX) to Chicago, Illinois, making the reservations in his and his father's (Willie Townsend) names. Nobles and Townsend arrived at the airport just minutes before the scheduled departure time of the 11:44 p.m. flight, and when Nobles went to the ticket counter to pay for his tickets, with cash, he was informed that the flight was secured and ready for departure. He proceeded to purchase two tickets on the 12:40 a.m. American flight 580 to Dallas, with a connection to O'Hare, and paid for the tickets with $1,346 in cash.

At approximately 7:30 a.m. on March 21, Officer Pamela Triner, a Chicago Police Officer assigned to the DEA O'Hare Task Force, received a telephone call from a Deputy Sheriff from San Bernadino, California who had reviewed the American Airlines flight manifest[5] for flight 580. He informed Triner that two individuals named Corey Nobles and Willie Townsend had paid cash for tickets at LAX, less than an hour before their plane was due to depart, and were arriving in Chicago on American Airlines flight 580. The deputy did not provide Triner with any other description other than the individuals' names. Officer Triner met Officer Tom Granias, who was also a member of the Chicago Police Department and the DEA Task Force, at O'Hare. Triner testified that she and Granias wore civilian clothing, were neither armed nor carrying handcuffs, and that a third officer, Anthony Opiola, assigned to

their detail, was stationed near the escalators and the exit from the concourse, observing the activities as she and Granias were waiting for flight 580.

Triner stated that she and Granias watched passengers leaving the airplane, and while looking for two men traveling together, they observed two men, later identified as Nobles and Townsend, deplane. They were among the last passengers to leave the aircraft, but were the first pair of men to deplane together. The officers commenced surveillance of the pair. According to Triner, one man (Nobles) was carrying a black canvas bag with the word "Guess" printed thereon and the other man (Townsend) had no luggage.

As the two men walked in the direction of the main terminal, Triner informed the court that she observed Nobles walking several steps behind Townsend, with the black, canvas bag over his right shoulder. Nobles continuously patted the bag with his right hand and Officer Triner stated that she observed both men frequently "looking over both shoulders and looking at people passing by [them]." The two men stopped at the front of the concourse where it joins the main terminal, and "began looking all around them, looking back from the way they just came from." At this time, Triner and Granias approached Nobles and Townsend.

Triner stated that she and Granias walked up to the two men, immediately identified themselves as police officers, and engaged the pair in a conversation by asking Nobles and Townsend if they would answer a few questions. The officers were standing two to three feet away from the two men, and were not blocking their paths to the escalators or exits. Opiola, who was standing about twenty feet from them, testified that he saw Triner and Granias display their police identification and Triner observed that Nobles' hands began shaking as he looked at the officers' identification (badge).

Nobles and Townsend agreed to speak with the officers and Granias asked if the officers could see their plane tickets and

---

**5.** A flight manifest is a list of passengers which includes the name of each passenger and the

time, amount, and mode of payment for each ticket.

identification. Triner testified that Nobles and Townsend looked in their pockets and Townsend replied that he had he left the tickets on the plane and must have lost his wallet. Nobles also was without identification. At that time, Triner observed two plane tickets sticking out of Nobles' back pocket, contrary to Townsend's statement that the tickets were still on the plane.

After Nobles and Townsend told the officers their names, Granias asked the men how long they had been in California, to which Townsend responded that he and his son[6] were in Los Angeles for about two days. Triner informed the court that Granias told the suspects that he and Triner were Chicago police officers and stated that they were conducting what he termed narcotics "interdictions" at the airport, and further advised the two men that they were not under arrest and were free to leave at any time. Granias also stated that he would like to ask them a few more questions; Townsend replied "Okay," and Nobles nodded his head in assent.

Triner testified that by this time Townsend appeared to be sweating profusely. When the officers asked him "what was wrong," (i.e., why was he perspiring so much) Townsend replied he had too many Long Island Iced Teas, an alcoholic beverage. Triner observed that the terminal building was not warm, did not notice any alcohol on Townsend's breath, nor that he was slurring his speech, nor did any of his movements indicate that he was intoxicated.[7]

Opiola testified that although he was unable to hear any of the exchange between the officers and the men, he noticed that Nobles and Townsend acted nervously during the conversation; they were "standing in place, but they were moving, constantly moving their bodies. They were looking at each other—it appeared to me that when a question was asked, before a question was an-

swered, they would look at each other, and then an answer would be given."

Triner informed the court that Officer Granias asked Nobles if the bag he was carrying belonged to him. Nobles, again after looking over at his father, responded in the affirmative. Officer Granias next inquired of Nobles if he "had packed [the bag] himself," and "if anybody had given [him] any packages to carry that [he] didn't know the contents of." Nobles, who according to Triner was now breathing rapidly and whose hands were visibly shaking, glanced at his father before responding no. Granias repeated that Nobles and Townsend were not under arrest and were free to leave and asked them if he could ask a few more questions. Nobles and Townsend each agreed to continue speaking with the officers.

Triner also testified that Granias asked Nobles for permission to search his black bag inscribed "Guess." Nobles looked toward his father, dropped the bag from his shoulder and told the officer, "Go ahead." Opiola testified that he witnessed Nobles drop the bag from his shoulder and that neither of the officers touched the bag until it was on the floor. Officer Triner stated that she bent down to search the bag and in it, under some clothing, she found a large white plastic bag, which contained several clear packets of white powder, one she described as a clear packet with a "tan, rocky substance," and she also related that she discovered two packages sealed with blue duct tape. Officer Triner stated that at that time, based upon her experience, she believed that the clear bags contained cocaine and crack cocaine (cocaine base).[8] Officer Opiola testified that this entire encounter, since Granias' initial inquiry, lasted approximately two minutes.

Triner informed the court that after the officers discovered the plastic and duct-taped packages within the white plastic bag in Nobles' luggage, and while they were still in the

---

6. Nobles' mother and Townsend were not married and Nobles shares his mother's last name.

7. After the men were arrested, Triner spoke with a representative of American Airlines who informed her that American did not serve Long Island Iced Teas.

8. Roger Guelster, a forensic chemist for the DEA, later examined the contents of the plastic bags and determined that the bags contained 774.9 grams of a white powder mixture that was 94% cocaine, and 231.7 grams of a tan rock-like substance that was 83% cocaine base. The parties stipulated to the results of Guelster's examination at trial.

public concourse, she and Granias placed Nobles and Townsend under arrest and asked them to step over to the side of the concourse. They proceeded to conduct pat-down searches of their persons, in public view, in order to make sure that they were not carrying anymore contraband or weapons. During the search, Triner observed Granias discover cash dispersed in Nobles' shirt, pants and coat pockets, which was later counted and totalled $14,928, airline tickets for flight 580 with their names on them, as well as an electronic pager. After the men were searched, Officer Opiola, standing in the same place, observing the encounter with Nobles and Townsend, joined Triner and Granias, as the defendants were escorted to the DEA office in the airport. Once in the office, Opiola immediately advised the two men of their *Miranda* rights, Nobles and Townsend each replied that they understood those rights, and agreed to waive them. The officers requested that Nobles and Townsend empty their pockets and conducted a further search of their persons. The defendants remained un-handcuffed during the questioning.

Even though Nobles was in possession of the money and drugs the officers found, Triner and Opiola stated that Townsend attempted to assume all the responsibility and informed the officers that the money and drugs belonged to him, and stated that his son had no knowledge of the cocaine and crack cocaine in the bag. Opiola asked Nobles if he was aware of the contents in the bag he was carrying and at this time, "Nobles looked at Mr. Townsend, paused a few seconds, and [stated] 'kinda.'"

During the suppression hearing, Nobles' version of the events that transpired at O'Hare differed from the testimony of Officers Opiola and Triner. Nobles testified that as he and Townsend were walking down the concourse in O'Hare, proceeding toward the main exit, Officer Granias "kind of rudely bumped into [Townsend].... from the left ... And he kind of just stopped [Townsend] in his footsteps or whatever. And he began talking fast, asking questions, ... [and] a lady came to my right, on my right side, and began asking me questions or whatever, and

referring to the bag I was carrying." When Townsend stated that he was not in the mood to speak to the officers, at that time, Granias allegedly grabbed him, identified himself as a Chicago police officer, and told Townsend, "If you try to run, we have the right to shoot you in your back." Nobles explained that during the encounter, he kept looking at his father because Townsend had been drinking on the flight and Nobles wanted "to make sure he didn't misunderstand what the guy was saying and didn't try anything or whatever. And I was kind of paying attention, just making sure my father was all right."

Nobles next alleged that Officer Triner had a grip on the strap of his shoulder bag the entire time they were speaking, and that Triner asked the two men to step over to the right. Nobles testified that as he and his father moved, Triner pulled the bag off his shoulder and it fell to the floor. Agent Granias then allegedly repeated, "Remember, I have the right to shoot you in your back if you try to run." Nobles stated that at no time was he advised that he was free to leave, nor did he consent to the search of his bag. Nobles also informed the court that he was never advised that he did not have to answer the officers' questions, and he neither waived nor was read his *Miranda* rights upon arrest. Townsend refused to testify at the suppression hearing.

The district court denied Nobles' motion to suppress the evidence seized at O'Hare, based on Triner's, Opiola's, and Nobles' testimony. Thereafter, the case proceeded to trial, and the government presented the testimony of Officers Triner and Opiola, as well as the expert testimony of DEA Agent Kevin Lane, a ten year veteran of the DEA and the supervisor of the DEA Chicago Police Department Drug Task force, who testified generally concerning the nuances of the drug trade in America today.

The jury returned a verdict convicting Nobles of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (commission of the offense as a principal), but acquitting him of the count charging possession with intent to distribute cocaine base.

The trial court received a pre-sentence report, recommending that the court, applying the Sentencing Guidelines, assess Nobles' base offense at 26, and enhance the base level two points for obstruction of justice, U.S.S.G. § 3C1.1, stating that during the suppression hearing, the defendant knowingly misrepresented the facts concerning his encounter with the officers at O'Hare. The probation officer also recommended that Nobles be denied a four level reduction in his offense level for his alleged "minimal participant" status in the drug trafficking, U.S.S.G. § 3B1.2, rejecting the defendant's post-trial characterization of his role as that of an uninformed courier for a single, small transaction. Nobles' criminal history category was III,[9] and combining this with adjusted offense level 28 yielded a sentence range of 97 to 121 months incarceration. The trial judge adopted the recommendations of the presentence report, and sentenced Nobles to a term of 100 months imprisonment, to be followed by a term of five years supervised release, and imposed a special assessment of $50.00.

## II. ISSUES

On appeal, Nobles alleges that: (1) the district court committed clear error when it denied his motion to suppress the cocaine, crack and money seized, determining that his encounter with the officers at O'Hare was consensual; (2) the trial judge abused his discretion when he allowed DEA Agent Lane to present expert testimony about drug trafficking in America; (3) the district judge abused his discretion when he read the jury the "conscious avoidance" instruction; (4) the evidence presented was insufficient to sustain his conviction beyond a reasonable doubt; (5) the trial court committed clear error when it determined that Nobles played more than a "minimal" role in this drug trafficking offense and did not qualify for a reduction in his offense level pursuant to U.S.S.G. § 3B1.2; and (6) the district judge committed clear error when he found that Nobles' representation of the facts surrounding his

encounter with the police at O'Hare amounted to obstruction of justice and merited an enhancement in his offense level under U.S.S.G. § 3C1.1.

## III. DISCUSSION

### A. MOTION TO SUPPRESS

Nobles, relying on *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), argues that his entire encounter with the officers leading up to the search of his bag was unconstitutional because the officers did not have "specific and articulable facts" to justify stopping and questioning him and his father. He contends that Triner and Granias had no physical descriptions of the pair, nor did they have any other facts which could justify an inference that the two were involved in criminal activity. Nobles also asserts that the officers followed the first two African–American men who deplaned together, and stopped them merely because they were looking around the terminal. Thus, the drugs seized from his bag and the money found in his pockets should have been suppressed as the fruits of an illegal search and seizure.

The government responds that the entire encounter between the officers and Nobles and Townsend was consensual. The trial judge, agreeing with the government, ruled that the encounter in the airport was consensual, including the search of Nobles' bag.

The denial of a motion to suppress evidence is reviewed deferentially. An appellate court will reverse only if the district court's decision was clearly erroneous. When the district court's decision rests on credibility determinations, this court has stated that "the trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony." In other words, "[w]e must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face

9. Nobles had four prior convictions for driving with a suspended license, and two convictions for unlawful use of a weapon.

that no reasonable factfinder could accept it."

*United States v. Eddy,* 8 F.3d 577, 580 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994) (citations and quotations omitted). "The question of whether a particular encounter is voluntary is a factual one, dependant on the circumstances of each case." *United States v. Maldonado,* 38 F.3d 936, 939 (7th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 205, —— L.Ed.2d —— (1995) (quotations omitted). This court will "not retry issues of fact or substitute our judgment with respect to such issues for that of the trial court." *United States v. Adebayo,* 985 F.2d 1333, 1337 (7th Cir.1993) (quotation omitted).

■ "It is well-established that the Fourth Amendment does not prohibit all searches and seizures, but only those that are 'unreasonable.'" *United States v. McCarthur,* 6 F.3d 1270, 1275 (7th Cir.1993). This court has enunciated "three categories of police-citizen encounters and the Fourth Amendment requirements imposed on each of them:"

> The first category is an arrest, for which the Fourth Amendment requires that the police have probable cause to believe that a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*Id.* (citations omitted). "With regard to the third category, the consensual encounter, the degree of suspicion that is required is zero." *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992).

■ The Supreme Court has established an objective test to determine whether a person has been "seized" such that Fourth Amendment protections are triggered: "a person has been 'seized' within the meaning of the Fourth Amendment ... only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quotation omitted). "The law is well established that if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement was restrained, or believe that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." *Id.* (quotation omitted).

Nobles mistakenly argues that Triner and Granias should have had "specific and articulable" facts to support an inference that he was in the process of committing a crime before they approached him at O'Hare, but this court has made it clear that "what has become known as a *'Terry'* stop differs from a brief consensual encounter, from which a reasonable person would feel free to walk away, *since an officer need not have any level of suspicion for a consensual encounter.*" *United States v. Soto–Lopez,* 995 F.2d 694, 697 (7th Cir.1993) (citations omitted and emphasis added); *see also United States v. Adebayo,* 985 F.2d 1333, 1338 (7th Cir.1993), *cert. denied sub nom., Davis v. United States,* —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993).

■ "Consent [encounters and] searches are valid only if the consent was freely and voluntarily given." *Adebayo,* 985 F.2d at 1340.

> When evaluating whether a stop is consensual, a court determines whether the encounter occurred in a public place, whether the suspect consented to speak to the officers, whether the officers informed the individual that he was not under arrest and was free to leave, whether the individuals were moved to another area, and whether there was a threatening presence ... of several officers and a display of weapons or any physical force.

*United States v. Robinson,* 30 F.3d 774, 782 (7th Cir.1994). Other factors this court has

considered when assessing the consensual nature of a police-citizen encounter include "whether the person was deprived of documents without which she could not continue on her way, such as a driver's license or a train ticket," *McCarthur*, 6 F.3d at 1276, and the officer's "use of language or the tone of voice indicating that compliance with the officer's request might be compelled." *Withers*, 972 F.2d at 842 (quotation omitted).

We have reviewed the record from the suppression hearing, and although Nobles gave a different version of the encounter at the airport, we defer to the district judge's determination that Officers Triner's and Opiola's account of the conversation in O'Hare was more credible than Nobles'. The court explicitly rejected Nobles' claims that Granias threatened to shoot him in the back should he walk away from the officers, and that Triner grabbed the bag from the defendant's shoulder and searched it without his consent.

We have stated on numerous occasions, that as the fact finder

> [i]t is up to the trial judge to make the credibility determination. The trial judge has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture, and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.

*Eddy*, 8 F.3d at 582–83. We refuse to second-guess the trial judge on matters of credibility unless the defendant establishes that the testimony was "exceedingly improbable." *Id.* at 580. Nobles has offered nothing but his own self-serving assertions to contradict Triner's and Opiola's testimony.

Based on Triner's and Opiola's testimony, the district court made the following findings of fact: the encounter took place in a crowded airport; the officers displayed their identification, told the defendant several times he was not under arrest and advised him that he was free to leave; the officers did not block the defendant's path, step in between Nobles and his father, or move them to another area; and unarmed, in plain clothes, and without handcuffs, the officers did not act in a threatening manner, show any force, or touch either of the men. Furthermore, Officer Triner testified that the entire exchange took place in a "normal, friendly type conversation[al]" tone, and Opiola stated that it lasted but a short time. A reasonable person, who was engaging in a "normal" conversation with plainclothed, unarmed officers, in a crowded airport, whose path was not impeded, and who was specifically advised that he was free to leave and not under arrest, would feel that he was free to leave the scene, *Chesternut*, 486 U.S. at 573, 108 S.Ct. at 1979, and thus, given these facts, we hold that when Nobles agreed to answer the agents' questions, he was acting freely and voluntarily.[10]

The trial court also found, in accordance with Officer Triner's testimony, that in response to Officer Granias's questioning, the defendant stated that the bag was his, he had packed it himself, and no one gave him anything to put in the bag of which he did not know the contents. When the officers requested permission to look in the bag, the defendant dropped it from his shoulder and stated, "Go ahead." Both Triner and Opiola testified that at no time before Nobles dropped his bag to the floor did either of the officers ever touch the bag. Thus, based on the record before us, including the district judge's credibility determination, we agree that Nobles voluntarily consented to the search of his bag, without threat or coercion.

We also note that on numerous occasions, this court has held that similar encounters between citizens and law enforcement officials were consensual, thus not subject to requirements of the Fourth Amendment. In *United States v. Maldonado*, the "encounter took place in the middle of a public train

---

10. We also note that Nobles "was not an overawed youngster being confronted with law enforcement for the first time." *United States v. Rice*, 995 F.2d 719, 724 (7th Cir.1993). He had six prior convictions, four for driving with a suspended license and two for unlawful possession of a weapon. Nobles was familiar with his rights and was no stranger to speaking with law enforcement officials.

station, the drug enforcement officers were dressed in civilian attire, and no weapons were displayed. Furthermore, the agents testified that they specifically told Maldonado that he was free to leave, that he was not under arrest, and that he was not required to answer their questions." 38 F.3d at 939. Under these circumstances, this court concluded that "not only was the fourth amendment not violated, but it was not implicated because the defendant voluntarily consented to the initial encounter and subsequent questioning." *Id.*

We have also held that

when police approach a person in a train station, identify themselves as police officers in a non-threatening manner, and ask that person questions regarding her identity, destination, or travel plans, or even request permission to search the person's baggage in a tone that does not imply that her cooperation will be compelled, there is no "seizure" requiring Fourth Amendment scrutiny.

*McCarthur,* 6 F.3d at 1276 (citing *Florida v. Bostick,* 501 U.S. 429, 437–39, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991)).

The officers' seizure and search of Nobles's bag was virtually identical to the facts presented in *Adebayo,* a case in which the defendant made the same allegation as Nobles: that DEA agents grabbed his bag (briefcase) and searched it without his consent. 985 F.2d at 1340. In *Adebayo,* we also held, relying on the trial judge's assessment of the credibility of the law enforcement officers' testimony, that contrary to the defendant's claims, the search was consensual because:

According to the record and the district court's findings of fact, the agents did not, as Davis claimed, grab Davis and his briefcase and jacket without Davis' consent. Instead, the district court determined that the agents informed Davis that he was not under arrest and was free to leave, and that when the agents asked Davis if they could search his briefcase they also informed him that he could refuse their request. Davis was not in police custody, was in a public area, [an airport], and the police used no force against him. Davis voluntarily consented to the search of the

briefcase. They agents then sought Davis' permission to search his jacket, and Davis signalled his consent to that search by raising his arms and stating " 'Go ahead' or words to that effect."

*Id.*

The district judge made a credibility determination and found the officers' testimony more worthy of belief than Nobles' testimony. We refuse to second-guess the trial court on matters of credibility, and from our review, we accept the court's determination that the arresting officers engaged in a purely consensual encounter with the defendant Nobles and his father, and that the ensuing conversation was not a *Terry* stop in which the officers needed "specific and articulable facts" to justify questioning the defendant and his father. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. We hold that the district court did not commit clear error when it ruled that the money and drugs seized from Nobles at O'Hare were the fruits of a legal search and seizure.

## B. EXPERT TESTIMONY

Nobles contends that he was prejudiced by the admission of the expert testimony of DEA Agent Lane because his testimony was largely unrelated to the issue of whether or not the defendant knowingly possessed the cocaine and cocaine base in his bag. The defendant further maintains that when Lane referred to people who "use and sell drugs" as "defendants," he created the prejudicial inference that because Nobles was the "defendant" in the case, he must have been guilty. The government responds that Lane imparted general information to the jury concerning the drug trade in the United States, including the pricing, processing, purity, transportation, distribution, and sale of narcotics, and that because the average juror would have no knowledge of these details, the testimony assisted the panel in evaluating the evidence before them, and was thus, not unfairly prejudicial.

 The defendant offered no objection to Lane's qualification as an expert or the substance of his testimony, and the district court admitted the evidence. Nobles'

failure to "make a timely assertion of" his objection to the admissibility of this evidence at trial results in a forfeiture of this objection, *United States v. Perez,* 43 F.3d 1131, 1136 (7th Cir.1994), and we will review this issue for plain error only. *United States v. Rose,* 12 F.3d 1414, 1422 (7th Cir.1994). Although we have the discretion to correct plain errors, "[t]he Supreme Court has ... directed that the courts of appeal 'should not exercise [their discretion to correct forfeited errors] ... unless the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting, *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)).

 Federal Rule of Evidence 702 "permit[s] the admission of the opinion testimony of a witness qualified by the court as an expert if the witness' specialized knowledge will assist the trier of fact to understand the evidence in the case." *United States v. Briscoe,* 896 F.2d 1476, 1497 (7th Cir.), *cert. denied sub nom., Usman v. United States,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). "[T]he operations of drug dealers are generally an appropriate subject for expert testimony." *United States v. Rollins,* 862 F.2d 1282, 1292 (7th Cir.1988), *cert. denied sub nom., Slaughter v. United States,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). "[B]ecause the clandestine nature of narcotics trafficking is likely to be outside the knowledge of the average layman, law enforcement officers may testify as experts in order to assist the jury in understanding these transactions." *United States v. Sanchez–Galvez,* 33 F.3d 829, 832 (7th Cir.1994).

Agent Lane had been employed as a Special Agent with the DEA for ten years, he was a team leader for six Chicago Police Department officers whose function was to investigate drug-related homicides, testified that he had worked in "thousands" of drug cases during his career, and had received several commendations for his investigative work from both the Illinois State Police and the DEA. Thus, he "had knowledge of a particular area ... that ... came from experience, education, and training; all acceptable bases of expertise under Rule 702."

*United States v. Stevenson,* 6 F.3d 1262, 1267 (7th Cir.1993).

Lane informed the jury that Los Angeles was a source city for narcotics in the United States. He also testified that cash was the preferred method of payment for illegal narcotics because drug traffickers "certainly would be apprehensive to be involved with money orders and the use of checks and banks, due to the nature of what the business is and thereby leaving a paper trail to further enhance the possibility for detection by law enforcement."

The agent further explained that the 774.9 grams of 94% pure cocaine that Nobles was carrying in his bag, when processed for retail sale, would result in approximately 3 kilograms of 24% pure cocaine, which would sell for roughly $300,000 on the street, and would be enough to provide over 24,000 individual doses of cocaine. Lane opined that this large quantity of cocaine could only have been intended for distribution, and not for personal use. Agent Lane also testified that those involved in dispensing large quantities of drugs, commonly carried electronic pagers, such as the one Nobles possessed, which

allow a person that's involved in the sale of drugs to be mobile, readily available, and accessible by clients, either buyers or sellers of a drug, and allows them to move about and be free to not be tied down to one telephone, which is frequently a concern for an individual involved with drugs, as they want to have the mobility to utilize pay telephones for what they feel would be to further reduce the chance of detection by the police.

Additionally, Lane explained to the jury the importance of the role of drug couriers:

LANE: A drug courier is a person or persons who are—whose role is normally for either a payment of drugs and/or money to transport drugs from one location to another and thereby take the risk or be involved with it. The transportation role is what their role is.

GOVERNMENT: Is there any added risk to a drug trafficking organization if a courier doesn't know what he is carrying?

LANE: Certainly.

GOVERNMENT: Could you explain?

LANE: If a courier doesn't know what that person would be carrying, he would be—maybe not as cautious or careful as to—their action, and thereby increase the risk for detection. Or they could just—if it's—the substance was in a case or a box, they—there is always the possibility that they could just not be cautiously aware of where that box or item was, and thereby not allowing the drugs—substance to be transported from point A to point B. You have to know, because of the risk involved and the amount of money that is involved in such transactions.

Thus, it is clear that Lane's testimony established the following facts: (1) that Nobles was travelling from a drug source city (Los Angeles); (2) he possessed close to $15,000 in cash, the preferred payment method for drug transactions, without a plausible explanation for such possession; (3) the defendant carried the equivalent of three kilos of cocaine ($300,000); (4) pagers (such as Nobles') are a tool of the drug trade; and (5) couriers are crucial to the success of a drug trafficking operation. Lane's testimony was relevant to the jury's determination of Nobles' guilt or innocence of the charges he faced because each of these facts enumerated above, aided the prosecution in demonstrating that Nobles had knowledge that he was involved in drug trafficking activity, and that he also had an intention to distribute the cocaine.

Before we conclude this discussion, we note that Agent Lane's passing reference to people who "use and sell drugs" as "defendants," merely referred to defendants who become informants for the DEA in order to receive recommendations for lesser sentences, and was not prejudicial when examined in context of Lane's entire statement:

GOVERNMENT: Over the course of the past ten years, have you had occasion to talk with persons who use and sell drugs?

LANE: Yes, I have.

GOVERNMENT: Who—what types of persons would those be?

LANE: Those people would be defendants, when I am acting in an undercover capacity, people that provide information to the DEA, such as informants, or people that don't wish to be termed an informant, the people that just wish to provide information and are involved in the illicit drug trade.

We do not agree that Agent Lane's statement implied that all defendants in drug cases are necessarily guilty of the crimes with which they are charged, nor was it prejudicial to Nobles when read in its totality.

 Additionally, at the close of the trial, the judge instructed the jury that:

The defendant is presumed to be innocent of the charges. This presumption remains with the defendant throughout every stage in the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty.

"Jurors are presumed to follow ... [all] instructions" from the court, *Doe v. Johnson,* 52 F.3d 1448, 1458 (7th Cir.1995) (quotation omitted), and we "rely on our belief that juries heed [their] instructions." *United States v. Davis,* 15 F.3d 1393, 1402 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994). The judge's instruction about the presumption of innocence compensated for the remotely possible speculative prejudicial impact the defendant might have suffered from Lane's fleeting reference to drug traffickers as "defendants." We are convinced that the district court did not commit error when it admitted Agent Lane's testimony as an expert in the field of drug trafficking methods and prices.

## C. CONSCIOUS AVOIDANCE INSTRUCTION [11]

Nobles argues that the district judge abused his discretion when he read the jury the following "conscious avoidance" instruction for there was insufficient evidence to support an inference that he consciously avoided acquiring knowledge of his father's drug trafficking activities:

11. This instruction is colloquially known as the "ostrich" instruction.

Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. You may find that if a person had a strong suspicion that things were not what they seemed, that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude, if you conclude that, that he acted knowingly, as I have used that word.[12]

Nobles continues that the effect of the instruction was to give the jury the impression that they could convict him for negligently failing to realize that his father was involved in drug trafficking, rather than requiring them to find that he "knowingly" possessed cocaine with the intent to distribute.

The government responds that the instruction was proper because in light of: Nobles' display of nervous behavior during his encounter with the officers (constantly moving around, looking at his father before responding to questions, rapid breathing and visible shaking); the fact that Nobles was carrying $14,928 in cash; purchased tickets and boarded the airplane at the very last minute with $1346 in cash; was transporting over $300,000 of cocaine; and stated that he "kinda" knew what was in his bag, there was sufficient evidence to support an inference that the defendant was consciously avoiding knowledge of his father's drug trafficking activity. The trial court found that if Nobles was insistent in pursuing his argument that he had no knowledge of the drugs in his bag, his possession of such a large amount of cash and a pager, as well as the fact that he purchased his airline ticket with cash, and "kinda" was aware of the contents of his bag, supported an inference that he remained consciously ignorant of the cocaine and crack he was transporting.

 "We review a district judge's decision to give the [conscious avoidance] instruction for an abuse of discretion." *United States v. Walker,* 25 F.3d 540, 546 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 371, 130

L.Ed.2d 323 (1994) (citations omitted). "The instruction should be given only when it addresses an issue reasonably raised by the evidence." *United States v. Stone,* 987 F.2d 469, 471 (7th Cir.1993). Additionally,

[W]e must review the evidence and any reasonable inferences that can be drawn from that evidence in the light most favorable to the government. In addition, we do not review instructions in lonely isolation, but rather in the context of the trial as an integrated whole.

*United States v. Gonzalez,* 933 F.2d 417, 434 (7th Cir.1991) (citations and quotations omitted).

 "While we have warned that this instruction should be given only when it addresses an issue reasonably raised by the evidence, an ostrich instruction is appropriate when the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *Id.* (quotations omitted); *see also United States v. Kladouris,* 964 F.2d 658, 668 (7th Cir.1992). "Essentially, the ostrich instruction states that a person cannot avoid the 'knowingly' requirement of a crime by consciously avoiding the truth about a particular transaction and then claim their actions arose through ignorance, accident or mistake." *Walker,* 25 F.3d at 545 (citations omitted). "It is well settled that wilful blindness or conscious avoidance is the legal equivalent to knowledge." *United States v. Rodriguez,* 53 F.3d 1439, 1447 (7th Cir.1995); *see also United States v. Giovannetti,* 919 F.2d 1223, 1228 (7th Cir.1990) ("A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires").

Nobles submitted the following instruction which the judge read to the jury: "The defendant's theory of defense is that he did not knowingly possess the drugs charged in the indictment; that both the money and drugs belonged to his father." Thus, Nobles "claim[ed] a lack of guilty knowledge" about the crime, in spite of his statement to Officers Opiola and Triner that he "kinda" knew what was in his bag. *Walker,* 25 F.3d at 546.

12. The judge instructed the jury that "[w]hen the word 'knowingly' is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident."

Next we determine whether the evidence supported an inference that Nobles' ignorance was deliberate, and in weighing the evidence, we must view it, and any inferences to be drawn from it, in the light most favorable to the government. *Gonzalez*, 933 F.2d at 434.

Nobles' nervous behavior at the airport, as testified to by Officers Triner and Opiola, indicated that he strongly suspected he was involved in some sort of wrongdoing. Further, Townsend was employed by a construction company and the record fails to reflect any legitimate business reason why he or his son would be in possession of nearly $15,000 in cash. That amount of money is large even for one who claimed to be on vacation. Nobles also purchased plane tickets at the last minute with $1,346 in cash. Under all the facts and circumstances contained in this record, it is almost inconceivable that Nobles would not have been suspicious of his father's access to so much money.

Triner testified that Nobles informed Officer Granias that the bag he was carrying was his, that he had packed it himself, and it did not contain any packages of which he did not know the contents. The cocaine and crack were found in this same bag and when Officer Opiola, in Officer Triner's presence, asked Nobles if he was aware of the contents of his bag, Nobles looked at his father for a few seconds, and then responded "kinda."

Nobles argues that Officer Triner's testimony that she heard the "kinda" statement was not credible because during the following colloquy, which took place at trial, she contradicted herself about whether or not she heard Nobles make this statement:

DEFENSE: Now, you testified that Officer Opiola said that—at one point to the kid that, well, did you—you didn't really know what was in the bag, and you said that he said, sort of, kind of?
TRINER: Kind of, yes.
DEFENSE: Were you in the room when that was said?
TRINER: Yes, I was.
DEFENSE: Now, you know, in your report—you don't say that in your report, do you, ma'am?

TRINER: Probably not.
DEFENSE: In fact, your story in your report is that—it says that Officer Granias escorts Nobles to the bathroom. And while returning to the office, Granias asks Nobles if he really didn't know what was in the bag? And Nobles says, kind of. That's what's in your report, right?
TRINER: That's in my report, because that's what Agent Granias told me. He wasn't in the bathroom with me.
DEFENSE: You really didn't hear this 'kind of' thing that you testified to, right?
TRINER: No.
DEFENSE: All right.
TRINER: I did hear it. No. That is not right. Yes, I did hear it.

When we examine this colloquy, it becomes clear that Nobles and his counsel are misreading Triner's testimony by quoting it out of context, rather than clarifying the full contents of her discussion of whether she heard Nobles state that he "kinda" knew what was in his bag. When the defense attorney asked Triner "you really didn't hear this 'kind of' thing that you testified to, right," she answered "no," as in "no, that is not right." Once defense counsel stated "All right," Triner explicitly stated, "I did hear it. No. That's not right. *Yes, I did hear it.*" In order to make sure that the defense attorney understood the substance of her testimony, Officer Triner reiterated that she did hear Nobles tell Opiola that he "kinda" knew what was in his bag. Nobles was convicted of possessing cocaine with the intent to distribute it; therefore the jury in all probability found Officer Triner's testimony to be consistent and credible and we refuse to second-guess the credibility determination of the jury as they had

the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture, and body movements, as well as confused or nervous speech pat-

terns in contrast with merely looking at the cold pages of an appellate record.

*Eddy,* 8 F.3d at 582–83 (quotation omitted).

When considering the totality of the facts and circumstances surrounding Nobles' arrest, including his nervous behavior at the airport, the fact that he purchased his airline tickets at the last minute with cash, he carried no identification, he was in possession of 774.9 grams of 94% pure cocaine, cocaine base, valued at some $300,000, and close to $15,000 in cash, that he carried a pager, and stated that he "kinda" knew what was in his bag, we can only conclude that Nobles was either aware that he was carrying drugs or had a strong suspicion of wrongdoing and kept deliberately ignorant of the facts.

Additionally, Nobles "has not made any convincing argument that the jury's verdict probably would have been different had the district court not given the ostrich instruction." *United States v. Allen,* 10 F.3d 405, 416 (7th Cir.1993). In fact, during oral argument, Nobles' attorney stated that the word "kinda" indicated "a degree of knowledge, not a deliberate ignorance of the fact." If "kinda" indicates a degree of knowledge, then Nobles had knowledge of the drugs and the "evidence against [the defendant] was his own words.... [T]he ostrich instruction was not likely to deflect whatever force the jury chose to give those words." *Id.* Therefore, we hold that the judge did not abuse his discretion when he gave the jury the conscious avoidance instruction.

## D. SUFFICIENCY OF THE EVIDENCE

Nobles' next contention is that the evidence received at trial was insufficient to prove his guilt of possession of cocaine with intent to distribute beyond a reasonable doubt. In support of the defendant's argument, he asserts that neither Opiola nor Triner were credible because their testimony was riddled with inconsistencies.[13] Additionally, Nobles maintains that the fact that the jury originally informed the judge that it could not come to a unanimous verdict with respect to the charges of possession of cocaine and cocaine base with intent to distribute, and subsequently rendered a split verdict, acquitting him of possession of crack, proves that the evidence was insufficient to sustain a finding of guilt.

The government responds that the inconsistencies Nobles alleges in the officers' testimony were minor, at worst, and the jury, as the finder-of-fact, chose to believe Triner and Opiola, rather than the defendant. The government further asserts that the evidence against Nobles was more than sufficient to prove, beyond a reasonable doubt, that he knowingly possessed the cocaine with the intent to distribute.

"In challenging the sufficiency of the evidence to support [a] conviction, [the defendant] bears a heavy burden." *United States v. Hill,* 40 F.3d 164, 166 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1385, 131 L.Ed.2d 238 (1995).

> As this court has often stated, [i]t is not the function of this [appellate] court to reweigh the evidence or to substitute its judgment for that of the trier of fact. When reviewing challenges to sufficiency of evidence supporting a conviction we consider the evidence presented at trial in the light most favorable to the government; if we conclude that any rational trier of fact could have found that essential elements of the crime were proven beyond a reasonable doubt, we will reject the defendant's sufficiency challenge.... Because questions of credibility are solely for the trier of fact, such arguments are wasted on an appellate court.

*United States v. Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994) (citations and quotations omitted).

> As an appellate court, we will not second-guess the jury on [the credibility determination], which was best resolved through

---

13. Nobles also argues that Officer Granias was not a credible witness at the suppression hearing, and attempts to use Granias' alleged inconsistencies in his sufficiency of the evidence argument. However, Granias did not testify at trial and his pre-trial testimony was stricken from the record. We have not considered any of Granias' testimony in our decision; thus we need not address the merits of Nobles' attack on Granias' credibility.

giving the ... jury the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].

*United States v. Lakich,* 23 F.3d 1203, 1210–11 (7th Cir.1994) (quotation omitted).

■ The evidence presented at trial established that Nobles fit the profile of a drug courier in that less than an hour before departure, he purchased two one-way airline tickets from Los Angeles, a drug source city, with $1346 in cash, and he carried an electronic pager. After departing from the plane and before the confrontation with the officers, Nobles and his father were continuously looking around and over their shoulders, as if to avoid detection, and while Nobles was speaking with the officers, he appeared to be less than calm for his hands were visibly shaking, he was breathing rapidly, was constantly moving around nervously, and looked at his father before answering any of the officers' questions.

The defendant had $14,928 in cash in his pockets and it is inconceivable and unbelievable that he was unaware that he was carrying this amount of money in his pockets. In addition to carrying the drugs with a street value of some $300,000, when queried by the officers concerning the contents of his bag, he stated that he packed it himself and that it did not contain any packages of which he did not know the contents. Officer Triner found cocaine and crack in the defendant's bag and when Officer Opiola specifically asked the defendant if he knew what was in his bag, Nobles responded "kinda." Finally, it is undisputed that these drugs could have been processed to produce approximately 24,000 individual doses of cocaine for street sale, an amount that the expert testimony of Agent Lane established could only have been intended for distribution. When we view this evidence in the light most favorable to the government, a reasonable jury could find, beyond a reasonable doubt, that Nobles knowingly possessed cocaine with the intent to distribute it. *Hatchett,* 31 F.3d at 1416.

Nobles posits that neither Officer Triner nor Officer Opiola were credible. We addressed Nobles' attack on Triner's credibility in Section III.C., *supra,* and we need not reiterate the discussion. Nobles posits that Opiola was not credible because when he described Nobles' and Townsend's demeanor while they were being questioned at O'Hare, Opiola stated that the two men were "[c]ool and casual. They were answering questions. They—shuffling around a little bit. They appeared to be a little nervous. They weren't cocky or mad. It seemed like they were answering questions real nice and polite." Nobles maintains that describing him and his father as both "cool and casual," and "nervous," is contradictory, and therefore, Opiola's testimony should not be considered credible. We disagree with counsel's interpretation of the meaning of Opiola's description of the men, as an individual can be easily described as acting "cool and casual" and still display nervousness.

We examined a similar detail in *Eddy,* where "the [defendant] argued that the agents undermined their credibility by contradicting themselves" about whether one of them made "small talk" with the defendant while his bags were being searched. 8 F.3d at 581. We found the detail about small talk to be a "minor discrepancy," *id.,* as is Opiola's description of Nobles and Townsend. We are confident that Nobles and his father were doing their utmost to appear confident and relaxed, as if they had nothing to hide, but in truth and in fact, the two men were caught "red handed." They were transporting the equivalent of three kilos of street quality cocaine, were looking around to see if they were being followed, and began sweating and breathing rapidly upon questioning from the officers, they had no identification, and allegedly no airline tickets. Under these circumstances, a trained officer, such as Officer Opiola, could certainly see through the facade and observe that the two men were truly nervous, in spite of their best efforts to appear otherwise.

Nobles also argues that his acquittal on the charge of possessing cocaine base with the intent to distribute is further proof of the insufficiency of the evidence because the evi-

dence supporting both charges was identical. His reliance on the split verdict, however, "is pure speculation because it is impossible to determine which party has been prejudiced by a split verdict." *Lakich*, 23 F.3d at 1211 (quotation omitted).

> [E]ach count in an indictment is to be treated as a separate indictment and an acquittal on one count does not dictate an acquittal on any other count. When a jury returns inconsistent verdicts, . . . it may do so for reasons other than a determination of innocence, such as mistake, compromise, or lenity.

*Id.*

Therefore, "there is nothing but speculation to support the defendant's assumption," *id.*, that the split verdict is an indication that the evidence against him was insufficient to establish his guilt of possessing cocaine with the intent to distribute. We note that it is not unusual for a jury to convict on one charge, and acquit on another, if they want to give the defendant a break for whatever reason, or they also might feel that the punishment for one crime is appropriately severe for both offenses. We refuse to venture a hypothesis as to why the jury split the verdict,

> but we point out that even if [the verdict] had been inconsistent, our Supreme Court, after noting that inconsistent verdicts 'often are a product of jury lenity,' has rejected as 'imprudent and unworkable' a rule permitting defendants 'to challenge inconsistent verdicts on the ground that the verdict was not the product of lenity, but of some error that worked against them.'

*Id.* (quoting *United States v. Powell*, 469 U.S. 57, 66, 105 S.Ct. 471, [477] 83 L.Ed.2d 461 (1984)). As the court explained:

> Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. . . . Courts have always resisted inquiring into a jury's thought processes; through this deference the jury brings to

the criminal process, in addition to the collective judgment of the community, an element of needed finality.

*Id.* (quoting *Powell*, 469 U.S. at 66–67, 105 S.Ct. at 477–78).

Whatever their reasons for acquittal on the possession of cocaine base charge, we will defer to the jury's "collective judgment," and will not overturn their verdict based on Nobles' "pure speculation" into their reasons for returning a split verdict. *Id.* The government presented sufficient evidence to support Nobles' conviction beyond a reasonable doubt, and we refuse to reweigh the jury's determination of the witnesses' credibility nor will we question the wisdom of their verdict.

## E. SENTENCING

### 1. *Minimal Participant*

Nobles argues that he was entitled to a four level reduction in his base offense level pursuant to U.S.S.G. § 3B1.2(a) [14] because of his "limited role as a courier and his lack of understanding of the full scope of the criminal activity." The government responds that Nobles was in possession of not only the crack and cocaine, but a substantial amount of money, as well as a pager, demonstrating that his role as a courier was crucial to the drug trafficking scheme, and he does not merit a reduction in his offense level. The trial judge sitting in judgment in denying the reduction stated:

> With respect to role in the offense, I do think he played a major role in the offense. The money was on his person. I suppose I will never know the whole truth—and maybe none of us ever will—but I think the money was on his person. He had his wits about him. His father by all accounts didn't—certainly when they got off the plane—and I just don't have any doubt that Corey knew what he was doing.

▮▮▮ "We review the district court's sentencing determinations under two standards. [ (1) ] We will not reverse factual

---

**14.** U.S.S.G. § 3B1.2(a) provides: "Based on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels."

determinations underlying the application of the guidelines unless they are clearly erroneous." *United States v. Ritsema*, 31 F.3d 559, 564 (7th Cir.1994) (citation omitted). "[A] factfinder's choice between two permissible choices cannot be clearly erroneous." *United States v. Francis*, 39 F.3d 803, 812 (7th Cir.1992) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)). (2) Although " '[a] question involving the interpretation of a Guidelines term, by contrast, is a matter of law subject to *de novo* review,' " *Ritsema*, 31 F.3d at 564 (quotation omitted), "we give due deference to [the district court's] application of the Guidelines to the facts" of the case. *United States v. Harrison*, 42 F.3d 427, 430 (7th Cir.1994).

■■■■ "When a defendant requests a decrease in his offense level, he has the burden of demonstrating that he is eligible for the reduction by a preponderance of the evidence." *United States v. Soto*, 48 F.3d 1415, 1423 (7th Cir.1995) (citation omitted). The Applications Notes for § 3B1.2 provide:

> 2. *It is intended that the downward adjustment for a minimal participant will be used infrequently.* It would be appropriate, for example, ... in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

(emphasis added).

■■■■ "The controlling standard for an offense level reduction under [§ 3B1.2] is whether the defendant was *substantially* less culpable than the conspiracy's other participants." *Id.* (emphasis added). "[T]he fact that one plays a much lesser role than another does not mean that one is a [minimal] participant." *United States v. Kerr*, 13 F.3d 203, 206 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994). When it appears that although one person was the "driving force" in a criminal scheme, yet the defendant still had "an integral role assisting him" in the enterprise, the defendant will not receive a reduction in his offense level pursuant to U.S.S.G. § 3B1.2(a). *United States v. Bolin*, 35 F.3d 306, 310 (7th Cir.1994).

■■■ "The Commentary to Section 3B1.2 of the Guidelines notes that a role as a courier may be sufficiently minor or minimal to permit an adjustment under this section of the Guidelines *where only a single transaction occurs.*" *United States v. Osborne*, 931 F.2d 1139, 1157 (7th Cir.1991) (emphasis in original). However, we are mindful of the fact that "[a] defendant's status as a courier does not necessarily mean that he is less culpable that other participants in a drug operation." *Id.* at 1158.

> [C]ouriers are an indispensable part of drug dealing networks. Without somebody to take the drugs across the [country], the drugs will never reach the illicit market. In addition, the mere fact that a defendant was apprehended while acting as a courier does not imply that the defendant is only a courier. The district judge need not accept the defendant's self-serving account of his role in the drug organization. Finally, even if the defendant were purely a courier having no knowledge of the other aspects of the drug-dealing operation, the defendant might nonetheless be a highly culpable participant in the operation. A courier who willingly undertakes illegal transit without asking many questions is especially valuable to a criminal organization. When police apprehend a studiously ignorant courier, the organization can rest comfortably, knowing that its other operations remain hidden from the law.

*Id.* "Very clearly, the courier performs an important conveyance and/or transportation function in a drug conspiracy and is a necessary culpable member who helps insure the success of the overall conspiratorial drug distribution scheme." *Id.* at 1159.

Nobles was arrested while carrying approximately 774.9 grams of 94% pure cocaine, which would have sold for approximately $300,000 on the street, 231.7 grams of 83% pure cocaine base, and nearly $15,000 in cash. He told Officer Opiola that he "kinda" knew that the drugs were in his bag, and it strains the limits of credulity to believe that Nobles was not aware of all the cash in his pockets. Furthermore, the quantity of cocaine and crack in Nobles' bag clearly dem-

onstrates that the defendant was not acting "as a courier for a single smuggling transaction involving *a small amount of drugs.*" U.S.S.G. § 3B1.2, Application Note 2. As Agent Lane testified, this quantity of narcotics was not for personal use, but rather, could be processed to three kilos of street quality cocaine, and was intended for distribution.

Townsend attempted to take the full responsibility for the drugs in his son's bag, and it is not unreasonable for a father to attempt to take the rap and save his son from a term of incarceration. "Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world." *Hatchett*, 31 F.3d at 1420. Townsend's and Nobles' self-serving assertion that the defendant was only acting as an uninformed courier for a single, small drug transaction, falls far short of convincing us that the district judge committed clear error when he determined that Nobles played a major role in this drug trafficking offense.

### 2. *Obstruction of Justice*

Nobles also asserts that the trial court erred in enhancing his base offense level for obstruction of justice because of his testimony at the pre-trial suppression hearing, pursuant to U.S.S.G. § 3C1.1.[15] The defendant maintains that he made no willful false statement of fact during the hearing, and the government was not significantly impeded in its investigation and prosecution as the result of any of his testimony. Nobles further argues that because Triner's and Opiola's credibility is subject to doubt, and the judge made no finding that he acted willfully or intended to avoid responsibility for his crime, his offense level should not have been enhanced.

The government responds that the district court's finding that Nobles testified untruthfully was a credibility determination which

should not be reversed on appeal. At the sentencing hearing, the court gave the following reasons for its decision:

> I thought that [Corey] not only disputed [the officers' version of the encounter at the airport], but that he created facts that didn't exist and did that in a knowing fashion.
>
> Now, we all know based on our experience as lawyers that about two months after a person has been stopped for going through a red light he could pass a lie detector saying that the light was green and really believe it because human nature wants to believe what is helpful to it to believe. In this particular case, though, I believe that Corey didn't tell the truth at those hearings, that he persisted in it at the second hearing and, therefore, I think I will—I will assess the two extra points for obstruction of justice.

 "The Supreme Court has held that a sentencing court may enhance a defendant's sentence under U.S.S.G. § 3C1.1 if the court finds that the defendant committed perjury." *United States v. Woody*, 55 F.3d 1257, 1273 (7th Cir.1995) (citing *United States v. Dunnigan*, 507 U.S. 87, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993)). "However, the sentencing court must make a specific finding that a defendant committed perjury prior to imposing this enhancement." *Id.*

> [I]f a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same under the perjury definition we have set out.... When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction or impediment of justice

---

15. U.S.S.G. § 3C1.1 provides that: "If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Application Note 3(b) provides that "committing, suborning, or attempting to suborn perjury" is "an example[] of the type[] of conduct to which this enhancement applies."

that encompasses all of the factual predicates for a finding of perjury. *Dunnigan,* 507 U.S. at ——, 113 S.Ct. at 1117.

"[T]he Court noted that a testifying witness commits perjury if while under oath he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than a result of confusion, mistake, or faulty memory." *Dillard,* 43 F.3d at 308–09 (citing *Dunnigan,* 507 U.S. at ——, 113 S.Ct. at 1116). "In *Dunnigan,* the Court held that the sentencing court's findings that 'the defendant was untruthful at trial with respect to material matters ... that were designed to substantially affect the outcome of the case' were adequate." *Woody,* 55 F.3d at 1273 (quoting *Dunnigan,* 507 U.S. at ——, 113 S.Ct. at 1117). The commentary to U.S.S.G. § 3C1.1 defines "material information" as information which, "if believed, would tend to influence or affect the issue under determination." Comment, Note 5.

■ At the suppression hearing, the defendant testified that the encounter with the DEA agents was not consensual, that the agents grabbed his bag off his shoulder, and threatened to shoot him if he tried to leave. This testimony is in stark contrast to the DEA agents' testimony that the conversation was consensual and as we have stated, *see* Section III.B., *supra,* we decline to reweigh the credibility decisions made by the district judge. Nobles' account of the encounter is certainly "material information" because it was directly relevant to the determination of the legality of the meeting between Nobles and the officers. The sentencing judge stated that he believed that the defendant "created facts that didn't exist and did that in a knowing fashion." Thus, the court *explicitly* made a finding that Nobles willfully testified falsely about a material matter before the court and this finding sufficiently encompassed the "factual predicates" of perjury as required by *Dunnigan.* 507 U.S. at —— 113 S.Ct. at 1116; *see also United States v. Emenogha,* 1 F.3d 473, 485 (7th Cir.1993), *cert. denied sub nom.,* —— U.S. ——, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994) (upholding district court's finding of obstruction of justice based upon the court's determination that defendant had perjured himself by testifying at a pretrial hearing on a suppression motion that he had been threatened by law enforcement officers).

■ Nobles also argues that the government failed to demonstrate it was significantly obstructed in the investigation or prosecution of the offense. However, Seventh Circuit case law is quite clear that "as a general rule, actual prejudice to the government is not required for an obstruction enhancement because § 3C1.1 calls for an enhancement not only when the defendant has actually obstructed justice but also when the defendant 'attempted to obstruct or impede' the administration of justice." *Francis,* 39 F.3d at 812 (citing *United States v. Stevenson,* 6 F.3d 1262, 1269 (7th Cir.1993); *United States v. Caicedo,* 937 F.2d 1227, 1234 (7th Cir. 1990); *United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990); and *United States v. Patterson,* 890 F.2d 69, 72 (8th Cir.1989)). Thus, Nobles' ultimate lack of success in obstructing justice will not relieve his responsibility for his attempt to do so, and we hold that the district judge did not err when he enhanced Nobles' offense level for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.

AFFIRMED.